## HANEY v. TEXAS & PACIFIC COAL CO.
### (No. 8929.)

(Court of Civil Appeals of Texas. Ft. Worth. Nov. 23, 1918. Rehearing Denied Dec. 21, 1918.)

1. MASTER AND SERVANT ☞276(3)—PROXIMATE CAUSE OF INJURY—NEGLIGENCE—EVIDENCE.

In coal miner's suit for injury from negligence in failing to remove débris after fall of earth and coal in mine chamber, evidence *held* to sustain trial court's finding that negligence was not proximate cause of injury.

2. NEGLIGENCE ☞59 — "PROXIMATE CAUSE."

The wrongful act or omission relied upon as constituting "proximate cause" of injury must be such as that therefrom the injury or some similar injury might be reasonably contemplated.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Proximate Cause.]

3. MASTER AND SERVANT ☞139—NEGLIGENCE IN GIVING ORDER—PROXIMATE CAUSE.

Defendant's mine foreman, even if he negligently directed a coal miner to work on right side of his room, could not have reasonably contemplated that miner would mine coal almost across the face of his room, leaving a projection, and thereafter undertake to mine under it, causing it to fall.

4. NEGLIGENCE ☞62(3) — "PROXIMATE CAUSE."

To be a "proximate cause," act or omission must be the direct or immediate cause having a continuous and natural causal connection between negligence and the injury, and, if broken by another's intervening, independent act, the original negligence is not the proximate cause.

Appeal from District Court, Palo Pinto County; J. B. Keith, Judge.

Suit by J. N. Haney against the Texas & Pacific Coal Company. Judgment for defendant upon a directed verdict, and plaintiff appeals. Affirmed.

Ocie Speer and Marvin H. Brown, both of Ft. Worth, and R. M. Ellerd, of Plainview, for appellant.

W. J. Oxford, of Thurber, and J. T. Ranspot, of Mineral Wells, for appellee.

CONNER, C. J. This suit was instituted by J. N. Haney against the Texas & Pacific Coal Company to recover damages for personal injuries received through a fall of a quantity of coal left in the condition it was by the alleged negligence of the defendant. The trial resulted in an instructed verdict and an adverse judgment, and the plaintiff has appealed.

As shown in the court's charge, the peremptory instruction was based upon two grounds: First, that the evidence failed to show the relation of master and servant between the plaintiff and defendant at the time of the injury; and, second, that the negligence of the defendant, as alleged by the plaintiff, was not the proximate cause of the injury, but that his (plaintiff's) own acts in removing the earth from beneath the coal was such proximate cause.

In order to illustrate the court's action and our final conclusion, it will be necessary to quote rather liberally from the amended pleadings upon which he went to trial, and also from his evidence. After alleging that the defendant was a private corporation engaged in mining coal and that the plaintiff was employed by the defendant at the time named to mine coal in room 5, shaft 10, in one of defendant's coal mines, it was further declared:

"Plaintiff alleges that it was the duty of the defendant, while plaintiff mined coal in said room, to keep same in a reasonably safe condition and to use reasonable diligence to prevent squeezes or falls from above, and it was the further duty of the defendant, when any squeeze or fall occurred, to make preparations to clean up the same within two hours from the time of notice given of such squeeze or fall; and that, if the defendant failed to make preparation to clean up such fall, then, in such event, it was understood and agreed that the plaintiff might clean up such fall at and for a stipulated price per shift.

"Plaintiff would respectfully show to the court that on or about the 20th day of May, 1914, he noticed evidences of a squeeze and fall in said room 5, and immediately notified defendant of same, through its proper agent and employé, and called for necessary help to prevent a squeeze or fall, and that the defendant failed to furnish said help, although notified as aforesaid, and although called for by the plaintiff, and as a result of such fall and squeeze of several tons, just how many plaintiff is unable to state, occurred in said room 5, covering up about seven or eight tons of coal which plaintiff had mined and had ready for removal and which plaintiff would have had removed but for the negligence of defendant in the particular aforesaid.

"Plaintiff would further respectfully show the court that the defendant, although obligated and bound to do so, and although notified of said fall and squeeze, failed to clean up said fall or squeeze, and in violation of plaintiff's rights, for a period of several days, refused to allow or permit plaintiff to clean up same, although plaintiff requested the privilege of doing so, as was his right, and the defendant refused to furnish a man to dig out the coal as defendant was obligated to do, and that on or about the 13th of June, 1914, long after said squeeze had taken place, defendant employed plaintiff to clean up that part of said room 5 in which he had been mining coal and contracted with plaintiff, to have mined by another man, as many tons of coal for plaintiff as were covered up by said squeeze; but that defendant failed and refused, after promising to do so, to furnish any one to assist plaintiff in remov-

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ing said coal and mining the same, by reason of which failure and negligence upon the part of the defendant said coal was not mined for plaintiff, which negligence on the part of defendant to furnish plaintiff a helper at the time, and the failure and refusal to permit the plaintiff to go in and clean up the fall, upon the defendant's failure to do same and defendant's direction to plaintiff to work elsewhere in said room, were the causes of a large vein of coal being left projecting and hanging into said room 5 from about June 12 to June 15, 1914, when and whereupon, in consequence of said vein of coal projecting and hanging for so long a time, it cracked in the rear, or just back of the earth beneath, which was supporting the same, all of which was unknown to the plaintiff; and that on June 15, 1914, plaintiff, not knowing the cracked and dangerous condition of said vein or lump of coal, projecting in said room, undertook to mine the same, the defect in said vein of coal not being visible to plaintiff. And while mining the same a lump from said vein of coal, weighing several thousand pounds, fell and caught plaintiff beneath it, crushing the bone in his leg, between the knee and hip joint, and otherwise lacerating, wounding, and bruising the plaintiff, from which injuries plaintiff suffered great pain, bodily and mentally, and still suffers great pain, and will continue to suffer the remainder of his life.

"Plaintiff would respectfully show to the court that the cracking and falling of said vein of coal and the injury of plaintiff by said fall was due to no fault of his, but that plaintiff exercised ordinary care in the manner in which he attempted to mine the same, and the said accident was due to, and was the proximate result of, the negligence and carelessness of the defendant in the particulars heretofore mentioned.

"Plaintiff respectfully alleges that if the defendant had made an effort to prevent a squeeze and fall, and had furnished an assistant to your plaintiff to clean up and take out said fall, after same fell, and if the defendant had permitted your plaintiff to have entered and cleaned up said squeeze and mined said coal, after defendant refused to do the same upon notice given by your plaintiff, after defendant refused to do the same upon notice given by your plaintiff, could have kept the face or front of the vein of coal, which was being mined by him, in a straight line, said accident and injuries would not have occurred, and that said negligence and carelessness in failing, neglecting, and refusing to so do was the direct and proximate cause of the accident and resulting injuries to this plaintiff.

"Plaintiff would respectfully show the court that the duty and obligation of defendant, pleaded by this plaintiff in paragraph 111 herein, rested in, and was supported by, the contract and agreement by and between defendant and plaintiff, and especially was it a part of said contract of employment that defendant company undertook and agreed and bound itself, when any squeeze or fall occurred in any working place such as that where defendant was working, to make preparations to clean up the same within two hours from the time of notice thereof, failing to do which the miner (such as plaintiff was) might clean up same, the company paying therefor at the rate of $2.84 per shift. That not only were the injuries so received by plaintiff proximately caused by the defendant's negligence, as herein above shown, but that in the respect wherein defendant failed to make preparations to clean up, and failed to clean up, the fall of coal and débris as above set forth within two hours after notice thereof had been given to defendant and with respect to its failing and refusal to permit plaintiff to clean up same, the said failure, conduct, and acts were each and all in violation of defendant's contract of employment with plaintiff, and the same resulted directly and proximately in the injuries to plaintiff as heretofore shown. And plaintiff here shows that said conditions of affairs in said mine and said break or defect in said vein of coal and in said falling thereof upon plaintiff and his said injuries, all as hereinbefore pleaded, were reasonably within the contemplation of defendant as a party to said contract and agreement of employment, at all times, and the defendant was, and is, chargeable in fact and in law with a knowledge of the fact that plaintiff's said injuries were reasonably likely to follow from defendant's said breach of its contract as herein shown."

The plaintiff testified that he had been working for the defendant at Thurber, Tex., in the defendant's coal mine about 2 years at the time he was hurt, and that he was a miner of some 18 or 20 years' experience, and that at the time he was working in shaft 10, room 5. He described the shaft as an opening from the surface of the ground, which in the present instance extended 230 feet down to the bottom of the mine; that from this central shaft radiated entries to the rooms in which the miners worked; that a room consisted of 36 feet facing on the bed of coal, of which 6 feet in the center was occupied by the railway upon which the coal, when mined, was transported to the mouth of the shaft, through which it was elevated to the surface; that lines between the rooms of miners were imaginary and termed "marches"; the general plan of mining was to keep the face of the coal even and progressively the same as far as possible; that in the mines the earth and other material necessarily removed in mining the coal was cast behind the workman on either side the small railway mentioned and was termed the "gob"; that a clear space from 4 to 6 feet between the face of the unmined coal and the gob was maintained for the purpose of free ventilation. At this point we quote from plaintiff's testimony as follows:

"A straight face is not to allow the coal to have butts in it, sticking out in the room, but keep it straight all along and even. You have a roadway in the center of the room, and a miner is allowed 15 feet of space on each side of his road, and his car comes right down to the face, where he loads his coal. That place is called a miners room or working place 36 feet wide. The way of doing our work is to dig for 36 feet along the face of the coal and take it out. If projections or noses of the coal are left in the room, it makes it bad to work and harder to work and is more dangerous. When

you leave a nose back that way and take the coal from each side, then the nose will break on the solid, and you cannot detect it. When it breaks, it stands there until it binds, and then it comes down. A projection is more liable to fall, than when the coal is in a straight line, and the projection is harder to handle. It is more liable to fall. 'Breaking on the solid' is to break ahead, where the mining dirt has not been taken out. I was working for the company as a coal miner during the month of May, 1914, and April, and also a part of June. I remember the circumstances of a fall or squeeze coming in the mines where I was working at that time. My recollection is that that squeeze came on or about the 20th day of May. I didn't observe that fall until I went into my place to work, and I noticed that the rock was falling and rock cracking and other stuff falling, and I noticed that there was a bad squeeze on hand. My room was No. 5 on what was supposed to be the tenth left entry, and it was what we call a 'sly entry.' No one worked on my left in rooms No. 4, 3, 2, or 1. Those rooms were cut off and abandoned. They were not being worked at that time. No. 6 and No. 7 rooms were on my left-hand side of my room. They extended numerically to the left. An Italian, I think his name was Jack Jockilett, worked room 6. Ben Eubanks worked room 7. There was an Italian working room No. 8; I don't know his name. There is not any regular marks or anything like that to distinguish one room from another. It is just an imaginary line. Once in a while you will see some men take a prop and make a cross-mark on it with a lamp to mark the room line, and some men take a pick and strike the coal for it. It is just a matter of each man digging 15 feet from his roadway on each side. It depends on the miner himself as to how much space is kept between the face of the coal and the gob, and how much mining he is taking out.

"When I came to my room that morning, I noticed there was a squeeze on, and I thought it was going to close the place. That was my notion about it. A squeeze is where the whole earth comes down and settles over the timbers, where the coal and stuff has been taken out and there is nothing to hold it up. Yes, sir; it is just a gradual coming down of the whole earth. When I first discovered this squeeze, there was not any rock down in my room; but shortly thereafter there was some. I knew there was coming a squeeze, because I could hear the rock breaking and see the little pebbles falling, and when rock breaks and there is nothing to support it you see the little scales falling off, and I saw that. Yes, sir; the squeeze finally came. It filled my road up for something like 40 feet, I reckon. It filled it up that far back from the face of the coal and closed the left-hand side of my place entirely. Yes, sir; that was on the side of my room next to room No. 6, Jockilett's room. It also covered Jockilett's rooms. I mean by filling the place, that it filled up our working places between the face of the coal and the gob. When a place is filled up that way, you cannot work the coal until the place is cleaned up and the rock loaded out or you go around the fall one. On the right side of my room there was a right smart little rock fell, but it didn't close the side entirely.

"When I discovered this fall and the condition

of things there, I reported to the boss. I reported either to Mr. Moon or Mr. Oiler. I can't say which. Mr. Oiler is pit boss at No. 10 mine. It is his duty to attend to the running of the shaft and give orders how it should be run. He has authority over the miners working in the rooms, and the management of the entire mine is in his hands. The work myself and other miners were doing at that time was under Mr. Oiler's control. Mr. Moon was the face boss. He is assistant to Mr. Oiler. He also had authority over the men there doing the digging, to a certain extent, but not as much as Mr. Oiler had at that time. Mr. Moon employed me to clean up my place. I think I met Mr. Moon first, and I told him there was a squeeze and the condition of the place. My purpose in making that report to him was that I wanted my place fixed up. I didn't have authority to fix it up was why I reported to him. The boss had authority to fix it. When a fall comes, the boss can either have the man that is working the place clean it up, or have a company man do it, according to our agreement. I am not sure but I think there is something in the book of rules about that. If it is, it is in writing. I think it is a little book. I think I would recognize the book of rules if I were to see them. At that time we were working under the 1914 contract or book. The 1915 rules had not gone into effect at that time. Yes, sir; that is the book of rules and contract we were working under at that time. I am not a good reader, but section O on page 25 of the agreement and scale of wages, that we were working under at that time, is as follows: '(O) Where a fall occurs in any working place the company shall make preparations to clean up the same within two (2) hours from time of notice. Failing to do so, the miner or miners affected may clean up same, the company paying at the rate of $2.84 per shift.'

"I reported this fall to the assistant boss just as soon as I got to him. Mr. Moon employed me to clean the road up myself. He paid me $2.84, or was supposed to. That was a shift. I mean, by a 'shift,' a day's work. I cleaned up the roadway. After I got my roadway cleaned up, my room was not ready to work. One side of my room was closed, and the other had a whole lot of rock in it. The left side of my room was entirely closed, and, about the time I got my roadway cleaned up to the face of the coal, I moved some rock right at the face, and there was 30 or 40 cars of rock came down. I went and reported that to the boss, and Mr. Moon was the man I met first that time, and he and I went back to my working place. He saw the condition it was in, and he tried to contract it with me to clean it up, and we couldn't agree. He tried to contract with me again to clean up the rock that had fallen. We couldn't agree. He only offered me $3.50, I think it was, to clean up the whole thing, of the rock that fell in the road, and I knew it was not enough. We went back to the bottom then and got Mr. Oiler, and he wouldn't offer me any more, and so he had it in his hands to lay me off and put some one else there, and he laid me off, and I was off some 8 or 10 days from then. When I returned my roadway was cleaned up. A company man did the work. I don't know how many he had in there. I was there two or three times, during that time, to see about it. Yes,

sir; it was finally cleaned up. The right-hand side of my room was cleaned up first. The company cleaned that up for me. They had Mr. Ramage do that work, I think. It took them something like a couple of hours to do that work, I reckon. After the right-hand side of my room was cleaned up, my room was not then ready for me to begin work. I did begin work on the right-hand side of my place. At that time the left-hand side of my room was closed.

"I had a conversation with the boss about opening up the left-hand side. The committee made a deal for me to open it up. I mean the pit committee. That is a committee that takes up the differences between the miners and the boss, in case that something comes up, and the miner and the boss cannot settle it, we call in the committee, and whatever the committee and the boss does the miner has to submit to. At the time the pit committee was composed of Henry Barnard, Frank Caro, and a Mexican by the name of Roscoe. Caro and Barnard are the men who made the contract. Yes, sir; I took it up with the boss. The result was that they gave the coal and a dollar a yard to go around this fall of coal or what we call butt through behind it.

"Q. In mining coal is it usual and customary to haul it out as fast as you get down, or how about that? A. I usually have coal in my place all the time when it is in working order. When this squeeze came, I had about two cars of coal down lying in the road. I had other coal that was covered by the squeeze. I guess I lost something like three tons of coal in the squeeze.

"Q. What is the rule with reference to the coal lost by a miner in a squeeze? A. The company is supposed to pay for the coal just as if they had got it out, or else mine him up that much more coal. The pit committee agreed with the boss for me to go ahead and open up this left-hand side of my place, butt through, and leave this coal that was covered up, for a dollar a yard and $1.32½ per ton for the coal I dug in butting through. I was to have a dollar a yard extra for butting through and opening up the place. Yes, sir; I accepted those terms. I opened up the left-hand side of my room. There was about 14 feet of space I had to open up in there is my recollection.

"Jack Jockilett came down on my place a foot or 2. I don't remember how far, but I think it was 14 feet that I opened up. I had a man in there with me just a little. He was Menford Barnard. He was a brother of Henry Barnard. In butting through on the left side of my room, I started on the right-hand side and taken a through and mined the coal up from the right-hand march to my roadway and broke it down and loaded it out. I would take down from 15 inches to 2 feet of coal at a fall there. I think I took three falls of coal down on the right-hand side of my place before I undertook to butt through on the left-hand side. After I had taken down these three falls of coal, I had a place to start in on the left side to butt through about 3 or 4, maybe 5, feet. I didn't measure it, and I just started to mining under the coal and taking a crowbar and wedge and breaking the coal off in chunks. I just went at right angles to the face of the coal and butted through there. I continued that course until I had butted clear through the closed space. After I got through there, I took a fall of coal down clear across my place, both right and left sides, along the face. I put the coal there on a straight face as soon as I could. When I got through butting through there, I had both sides of my room practically on a straight face. When I had that done, I notified the boss that I was ready for him to do that work and mine that coal up for me that he had agreed to mine up for me. Mr. Oiler was the boss. I am speaking about the coal I lost in the squeeze. I think the amount was estimated at three tons. The first time I went to Mr. Oiler, he said he had no man that day, and kinder laughed at me and went on, and I didn't say anything further to him. I went on back to work in my place. I went to work on the right-hand side.

"Q. Why did you go to work on the right-hand side? A. Well, I wanted to get the place as near on a straight line as possible in order to have the place in good shape when he sent the man. Mr. Oiler gave me instructions as to where to work after that. The second morning when I went to Mr. Oiler to get him to do this work, he says, 'No, I cannot do it to-day.' He says, 'Go ahead and work on the right-hand side of your place and leave it,' and says, 'I have no man I can furnish you to-day.' I went on back to work again. I went to work on the right-hand side of my place as he directed. There was no man working on the left-hand side of my room at that time. There was a man coming down digging an entry on my left cutting my place off. He wasn't in my room. I went to Oiler three times about digging for me the coal I had lost. He said he didn't have no man for me either time. I worked on the right side of my place because he told me to leave the left side. I worked on the right side of my place long enough that I put out quite another hump of coal that stuck out there 4 or 5 feet on the left side. I worked on the right until the left was behind 4 or 5 feet. That is what we call a nose or projection. I cannot tell you how wide that chunk of coal was, for that was the coal that crippled me. My judgment would be that it was 3 or 3½ feet wide. It was nearly the length of one side of my room. I guess it was 12 feet long. I don't know how long the coal laid there after it crippled me. Yes, sir; the right side of my room was mined down about 6 feet further than the left. It stayed that way until the third day, when I went to the boss again about this work. I went to the boss and told him it must be done, that the place was getting in a dangerous condition again, and he said he couldn't do it that day, and I made the remark that I guessed I would have to get the committee on it, and he walked off and left me, as far as from here to the end of the house, I guess, and that was in the morning just before all of us went down in the shaft, and he turned and says, 'If I haven't got a man up there by 10 o'clock, you go ahead and do it, and I will pay you for it.' He meant do that work. I was after him to mine that coal that I had lost in the squeeze. Yes, sir; the coal that the committee had awarded to me. That was what he was to pay me for. It was getting dangerous. It was getting dangerous that the rock might come in again if the coal was not removed. Yes, sir; I will state as a practical miner that it is dangerous for a nose or projection of

coal to lag behind that way. It is more liable to fall than when it is on a straight face, and it breaks and a person cannot detect it. He never did furnish any one else to mine up the coal that I had lost. I finally dug it myself.

"Q. Now, in doing this work, and digging the coal you had lost, what arrangements were made with reference to the coal that you dug at that time; were you to be paid for that? A. Yes, sir; I was to get a standard price of $1.32½ per ton. All the miners were paid the same, and that was the arrangement. We got that per ton. As the coal is hauled out of the mines, it is weighed, and we are settled with in accordance with that weight at $1.32½ per ton. When 10 o'clock came that morning, I had coal down on my right side, and I had to get it out so as to place timbers, and I didn't do but very little work on the left side of my room that day. I cleaned up the coal on the right side of my place and mined a little bit on the left side on Saturday. 'Mining' is taking the clay out from under the coal so you can get the coal down. I guess I mined the left side that evening about 8 or 10 inches, across the entire length of the nose. I had not tried to bring down any of the coal. There was no use to try to bring it down before it is mined. It is so tight you cannot get it down.

"Q. Now, as a practical miner, what is the usual and customary way of testing coal for breaks? A. My way and the usual way is tapping the coal with a pick. You can tell by the sound, and also put your hand on the coal when you tap it and feel it. That is the usual method employed by miners. If it is broken, it will sound hollow. Yes, sir; an experienced miner can tell from the sound, if there is a break in the coal. Yes, I tested that nose or projection for breaks while I was mining it. I tested it every 15 or 20 minutes. I tested it with a pick. I didn't detect any breaks, and I expected to have to get out and drill a hole and shoot it down, because I didn't think it was broken. That conclusion was based upon my testing the coal. The coal was not down when I quit Saturday evening. I went back on Monday morning about 7:30. I went to work on the left-hand side of my room on Monday morning. When I went in my place on Monday morning, I had a little car of coal on the roadway, and I loaded that out, and then I went to work on the left-hand side of my room. I made a test of the coal to see if it was broken. I tested it at that time with a pick. I discovered no evidence of a break. It sounded solid at that time. I didn't see evidences of a break or crack or fall. I received an injury there that morning. I cannot tell how long, exactly, I had been working when I was injured; but I think it was between 8 and 9 o'clock. I was mining the coal, and had my mining about all done, that I aimed to do, and the coal had broken ahead on the solid, and just before I quit mining it dropped down, like a brick from that ceiling, without any warning whatever, and it caught me. It caught me right along about the knee and thigh on the left leg and crushed my knee and thigh about two-thirds of the way up my thigh. No, sir; I didn't have my knee or leg under the coal while I was mining it. I was sitting just about in this position, I reckon, as near as I can show you. I was not sitting up straight. I was laying on my shoulder and sitting on my right foot, and my left one was straightened out down the face of the coal. I don't know how far my left leg was from the face of the coal. It was not very far, but it was not under it. I guess my leg was from 4 to 6 inches from the face along the side of the face. I don't know how much coal fell on me. I estimate that there was three tons of coal in the chunk that I was working on. Yes, sir; in my judgment there was as much as two tons of coal fell on me. It crushed my knee and thigh. I was not able to get out from under it. Men came and got me out."

On cross-examination the plaintiff testified:

"It is the person's duty who digs the coal to load it on the car and push the car out to the entry where the motorman picks it up and takes it out. * * * The company agrees to pay us $1.32½ per ton to mine coal and load it out on the cars and then push the cars into the entry where the motor can get it.

"Yes, sir; the boss comes in at times and tells up to pick the coal down or shoot it down. No, sir; the boss doesn't say, 'Haney take a pick and shovel and mine the coal this way.' He doesn't say that, but sometimes he comes in there, to see that we keep our rooms according to the rules. He is the general supervisor. He looks about it and sees that we are keeping it in accordance with the rules and the way we are supposed to do it. Yes, sir; I stated that a miner mines his coal according to his own judgment, and where he thinks best. I always work where I think it is best without the boss tells me otherwise. Yes, sir; I mine coal by digging under it frequently.

"Q. Well, suppose the boss didn't want it done that way, but wanted it done some other way? A. Well, I would have to do it as he says.

"Q. Can you name a single instance where that was done? A. Everybody does it.

"Q. Don't you know, as a matter of fact, that the miner resents the fact that the boss tells him how to get his coal? A. As long as a man has his place in normal condition, the man in the place does to suit himself; but, when I have a breakdown, I am supposed to work like the boss tells me. When it is in an abnormal condition, the company takes charge and has the work done. When everything is normal in the mine, I work the coal to suit myself. If I want to shoot the coal, I shoot it; and, if I want to dig it with a pick, I do that. If I want to prize it down with a crowbar, I do that. Nobody has a right to tell me how to get my coal, so long as my place is in a normal condition. When the place is in an abnormal condition, it is the duty of the company to place it back in normal shape. They do that work with company men, or they employ the man that is working the place to do it.

"I told Mr. Oiler about this projection, that it was getting dangerous, and I wanted it taken down. There was a shoulder there when I went to do that mining. When I went to him the last time, I told him I wanted him to mine the coal down, for it was going to get dangerous. Before that, Mr. Oiler and I couldn't agree as to what pay I should get for mining that down. He said he would put a company

man there to clean up the room, which he did while I was off the 10 days.

"Q. When you came back, you wanted $3.13 for doing the work, and Mr. Oiler only wanted to pay you $2.84? A. No, sir; I wanted pay for the coal that I lost in the squeeze. He agreed to make this coal good that I lost along in rotation with the deal he had made with the committee in opening up the place. I was to get $3.13 for the coal that I had already lost in the squeeze.

"Q. If I understand, you and Mr. Oiler had agreed that it was worth a shift? A. Never was any positive agreement made about it. The pit committee had not agreed that I was entitled to a shift for the coal. The committee had nothing to do with it. That was my and Mr. Oiler's business. Mr. Oiler and I had not agreed that it would take a shift to put that coal back. We had not decided how much it would take. I insisted it would take a shift to dig the coal, and Mr. Oiler didn't want to agree to it, and didn't want me to do it, because he would have to pay this extra.

"Q. The difference between $2.84 and $3.13? A. Yes, sir. We agreed that one shift would have dug the coal. Oiler said that $2.84 was enough for it. Finally, Oiler told me, the last time I went to him, that, 'if I haven't a man there by 10 o'clock to do that work,' I could go ahead and do it. I told him a man couldn't do the work from 10 o'clock on. I went to work there with the understanding that it would be a shift of $3.13.

"Q. You then went to work on the left-hand side of your roadway, and that was in your mind, and you understood that in addition to the $1.32½ per ton for the coal you would get from there, that you were entitled to $3.13 for the work of bringing that projection back to the face? A. They were not paying me for the work I was doing there, but that was paying me for the work I had already done. I was getting pay for the coal I had lost. He told me I could do it. I understood I was to get $3.13 for doing it. That was in addition to the $1.32½ per ton for the coal. Oiler and I had had differences about who was to do the work. I wanted Oiler to do it as he had agreed to. Our differences occurred over the price. I agreed that I would do it for a shift of $3.13. After I went to him the third time about the matter, he said, if he didn't have a man there by 10 o'clock, to do it myself. I pitched into it with the understanding I would get $3.13 and the coal. The $3.13, my understanding was, was for the coal I had lost.

"Q. You were not getting anything for digging that projection back? A. No, sir; I was digging that for the coal. If he had put a man in there to dig the coal, he wouldn't have had to pay the $3.13 to me for the back work. I knew that projection was becoming dangerous.

"Q. You stated you knew the coal would break because of its projection, and you expected that, didn't you? A. No, sir; I really was not expecting it. If you work coal regular, it breaks regular; and, if it stands awhile, it doesn't break so good. And this had stood and it had not broken in rotation with the other, and it finally broke, and broke back within 2 or 3 feet of the face, in thickness. The piece that fell was from 9 to 12 feet long, and the thickness of the vein was about 3 feet wide."

Henry Barnard testified for plaintiff:

"The boss has the right, under our working agreement, to tell the miner which side of his room to work on. The contract says the miner cannot abridge that right."

Under the evidence thus exhibited, and tested by the earlier cases, such as Magnolia Petroleum Co. v. Ry. Co., 187 S. W. 1085, and cases therein cited, it seems clear that appellant would be barred of the right to recover on the ground that, by the express or implied terms of his contract of employment, he assumed the risks arising from the danger of which he complained in his evidence, for it was not only obvious and known to him, but the work itself, that he undertook to do, was to remove a dangerous situation, temporary in character, that arose during the progress of his general employment. But in the view we have taken of the case we do not deem it necessary to stop to inquire whether, as appellant insists, the doctrine of assumed risk, as delineated in the many decisions on that subject and by the text-writers, has been abrogated by the act of 1913, which provides that, in actions to recover damages for personal injury sustained by an employé in the course of his employment, "it shall not be a defense * * * that the employé had assumed the risk of the injury incident to his employment." See Vernon's Sayles' Stat. art. 5246H. Nor do we deem it necessary to discuss or determine appellee's answering contention that appellant's relation to the defendant company was that of an independent contractor and not of an employé, and that hence the statute referred to has no application. We have concluded that we cannot disturb the trial court's finding that the negligence complained of was not the proximate cause of appellant's injury.

[1] Careful scrutiny of plaintiff's petition will disclose, we think, that the gravamen of his complaint, that has any support in the evidence, is that the defendant company was guilty of negligence in a failure to remove the débris or obstruction caused by the squeeze and consequent fall of the earth and coal in his mine chamber. His testimony indicates that such débris and obstruction was entirely removed before any injury whatever had occurred. It is at least clear from his testimony that he had butted through this débris and worked several throughs clear across the face of his room, after which by working on the right side of his room and to within some 3 feet of his left-hand march only, and by the contemporaneous forward movement of the work of the miner in room No. 6 on appellant's left, and that appellant's injury was the result of the fall of this projection after he had butted through the débris, and opened a clear space between his room and the one on

his left, and worked clear across the face of his mine for several throughs. No apparent necessity is shown, either in the pleadings or in the evidence for appellant, to thereafter so work as to leave the nose or projection which resulted in his injury. By his testimony, when his room was in normal condition he undoubtedly had the right to perform his work as he pleased; the foreman, it seems, had no right to direct him as to the particular place in his room that he should begin working, or as to the manner in which the coal should be mined. Indeed, as we construe the pleadings and evidence, but slight complaint was made of the act of the foreman in directing appellant to work on the right side of his room, and, in view of the fact that appellant had secured working space by butting through the débris and by working across the face of his mine several times, we are not inclined to attach much significance or weight to the foreman's direction, if any, to go to work on the right-hand side of the room. It is certainly clear that neither the allegations nor the evidence discloses that the foreman directed him to work so near the march on the left of his room as to leave the narrow nose or projection in the dangerous condition he says that it was. But, if we assume that the direction of the foreman constituted negligence, the direction followed by the labor of appellant and of the adjoining miner merely produced a dangerous condition. It was not shown that the nose or projection undisturbed was the result of any injury. It might have stood there indefinitely without causing injury save for appellant's own act in mining it in the manner he did. His action in this respect, we think, in legal significance, goes beyond merely raising the issue of contributory negligence.

He testified:

"That coal fell on me because it was broken and just fell. Yes, sir; it fell because I took the earth out from under it. * * * When the coal fell, I was mining under it with a pick. The thing that brought that coal down was removing the earth from under it. * * * I selected my own method of getting out this coal. We miners reserved the right to do that, and we did do that. * * * I did it to suit myself. Nobody had been in there and given me any directions after I began that work."

In discussing this evidence, however, we must not lose sight of the fact that the negligence alleged by the plaintiff to be the proximate cause of his injuries was that of defendant's failure to promptly clean up the débris caused by the squeeze, and not negligence on the part of defendant in so directing him as to necessarily leave a nose, or in directing him to remove the nose or projection of which the plaintiff speaks in his testimony. The greatest latitude of construction in his favor will permit us only to say that he does allege negligence on the part of defendant because of the direction of the foreman to work on the right side of his room, this, we think, giving the plaintiff the full benefit of the most liberal construction, cannot, under the authorities, constitute a proximate cause of his injuries. So much has been said and written on this subject that it seems almost superfluous to do more than to cite the authorities.

[2] We think, however, that we may here say on this phase of the case that the wrongful act or omission relied upon as constituting the proximate cause of an injury must be such as that therefrom the injury complained of or some similar injury might be reasonably contemplated. As illustrating this rule, see T. & P. Ry. Co. v. Bigham, 90 Tex. 223, 38 S. W. 162; Seale v. G. C. & F. Ry. Co., 65 Tex. 274, 57 Am. Rep. 602; Brazos Oil & Light Co. v. Crawford, 57 Tex. Civ. App. 389, 122 S. W. 916; St. L. & S. W. Ry. Co. v. Bailey, 168 S. W. 406; Ft. W. & R. G. Ry. Co. v. Neely, 60 S. W. 282, later in effect approved by the Supreme Court in Neely v. Ry. Co., 96 Tex. 274, 72 S. W. 159.

[3] Applying this principle as illustrated by the cases cited, it seems plain to us that from the mere fact that Oiler, the foreman, directed appellant to work on the right side of his room, he could not, assuming that such direction constituted negligence, have reasonably contemplated that the plaintiff would proceed in the mining of his coal almost entirely across the face of his room, thus leaving the nose or projection, and thereafter undertake to mine the same in the manner that he did. To assume that he could have so contemplated is to indulge in a greater degree of liberality in assumption than was indulged in the cases we have cited.

[4] On the other branch of the case—the one that we think is really made by appellant's pleadings—it seems yet more clear that the negligence complained of in a failure to remove the débris was not the proximate cause of appellant's injury, as will be seen by the authorities already cited. While, in order to constitute a proximate cause of injury, it is not necessary that the act or omission complained of as negligent should be the direct or immediate cause, there must be a casual connection between the two. In other words, there must be a natural and continuous flow of consequences which culminate in the injury so that it can be said that the negligence shown entered into and became an actual agency or efficient cause. If this "casual" connection be broken by the intervention of a wholly independent act of another which of itself causes the injury, then the casual connection is broken, and the original act of negligence becomes the remote and not the proximate cause of the injury. As already stated, plaintiff's evidence shows that the débris caused by the squeeze had

not only been left behind in quiescent form so that appellant had free action to work his room along the face of the coal from march to march, but also tends to show that this débris had been removed before appellant attempted to mine the nose or projection which fell and injured him. There was therefore no casual connection between the negligence charged and the injury. The connection had been entirely broken by the act of appellant which was the sole proximate cause of his injury.

We conclude that the judgment must be affirmed.