KANSAS CITY, M. & O. RY. CO. OF TEXAS. v. WOOD. (No. 6727.)

(Court of Civil Appeals of Texas. Austin. April 9, 1924. Rehearing Denied May 28, 1924.)

1. Master and servant ⬦111(1½)—Automatic couplers must be kept in repair.

Under federal Safety Appliance Act (U. S. Comp. St. § 8606), automatic couplers must not only be placed on cars, but kept in repair, and statute is not complied with where drawbars are allowed to get out of line to such extent as to necessitate employee's going between cars to align them in making coupling.

2. Master and servant ⬦111(1½)—Railroad's liability under federal Safety Appliance Act absolute.

Under federal Safety Appliance Act (U. S. Comp. St. § 8606) the mere exercise of reasonable care to maintain automatic couplers in an operative condition is insufficient, but in event of failure to comply with the act in keeping them in safe condition the railroad's liability for injury resulting therefrom is absolute.

3. Master and servant ⬦111(1½)—Preparation of drawhead preparatory to impact part of act of "coupling" within statute.

The preparation or alignment of a drawhead preparatory to impact of cars constitutes part of act of "coupling" within federal Safety Appliance Act (U. S. Comp. St. § 8606).

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Coupling.]

4. Master and servant ⬦265(4)—Burden on employee to show noncompliance with federal act.

Burden is upon employee of showing defect in coupling, constituting failure to comply with federal Safety Appliance Act (U. S. Comp. St. § 8606).

5. Master and servant ⬦278(6) — Evidence held not to show defective automatic couplers.

Evidence held insufficient to establish noncompliance with federal Safety Appliance Act (U. S. Comp. St. § 8606) in matter of supplying and keeping in repair automatic couplers.

6. Master and servant ⬦111(1½)—Car inspector making coupling held acting as inspector.

Car inspector injured while aiding in making of coupling held to have been acting wholly in capacity of inspector, and not as brakeman.

7. Master and servant ⬦111(1½)—Railroad's statutory duty to provide automatic couplers inapplicable to car inspector.

Railroad's duty under federal Safety Appliance Act (U. S. Comp. St. § 8606) to equip cars with and maintain automatic couplings for protection of employees does not apply to car inspector whose duty it is to inspect and repair defective couplings.

8. Master and servant ⬦111(1½)—Injuries to inspector of appliances not actionable.

Neither at common law nor under federal Safety Appliance Act (U. S. Comp. St. § 8606) can car inspector, whose duty is to inspect and repair safety appliances, recover for injury suffered in course of employment from defective appliances.

Appeal from District Court, Tom Green County; C. E. Dubois, Judge.

Action by Frank M. Wood against the Kansas City, Mexico & Orient Railway Company of Texas. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

---

⬦For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Collins & Jackson, of San Angelo, for appellant.

B. Q. Evans, of Greenville, and J. A. Thomas, of San Angelo, for appellee.

BAUGH, J. Frank M. Wood sued appellant for damages for personal injuries sustained by him at Fort Stockton, Tex., on June 18, 1920, while assisting in coupling a water car onto a fruit car. Wood had been employed by appellant railway company, which for brevity will hereinafter be called the railway company, as car inspector at San Angelo, Tex., and on June 17, 1920, was sent by said company to Fort Stockton to relieve one Akin, car inspector at that place. On the morning of June 18th, at about 6:20 o'clock, he was inspecting a freight train in transit in interstate commerce. While doing so, and just before he had completed his inspection, an engine pushed a water car, on the back end of which brakeman Garrett was riding, towards the fruit car in question, to couple onto the train. The appellee went between the cars to assist in the coupling and in the effort to align the drawhead of the cars his foot was caught and so injured as to require amputation just below the ankle.

The plaintiff alleged as the chief grounds of negligence of the railway company the failure of the outgoing inspector, Akin, to note and have repaired all defects in cars in the yards, which included the water car, before he O. K.'d them to plaintiff; negligence of the train crew handling the water car in failing to discover, repair, and advise him of its defects; failure of the railway company to equip the cars with proper devices to line up drawheads without the necessity of going between the ends of the cars to do so; and its failure to furnish cars with couplers that would couple automatically by impact as required by the federal and state laws. The case was submitted to a jury on special issues, and their findings thereon are succinctly stated in appellant's brief as follows:

"(a) That the coupler on the moving car which caused the plaintiff's injury was out of line to the extent that it would not couple automatically by impact without a person going between the cars; (b) that such condition was occasioned by a defect and insufficiency in the appliances used to keep the coupler in line; (c) that it was the outgoing inspector's duty to examine and repair the coupling appliance on the moving car; (d) that such inspector informed the plaintiff that all cars in the yard had been inspected and that there would be none for his inspection until a train came in; (e) that it was not the duty of the plaintiff to inspect the coupling appliances under circumstances shown; (f) that the outgoing inspector was negligent in failing to inspect and repair the defect on the moving car; (g) that such negligence on his part was a proximate cause of plaintiff's injuries; (h) that it was the duty of the brakeman to ascertain whether or not the moving car and its coupling appliances were in such condition that it would couple automatically; (i) that he failed to exercise such duty; (j) which was negligence proximately causing the plaintiff's injury; and (k) assessed the damages at $12,500.

"The court also submitted to the jury special issue No. 1A, in response to which it found that the sole and only purpose of the plaintiff in making the coupling in question was to determine whether or not the coupling apparatus would work, and special issues 3D, 7D, and 10D, requiring findings as to the plaintiff's own negligence, his contributory negligence, and proximate cause, all of which were answered favorably to the plaintiff."

## Opinion.

Appellant brings the case before us properly on 31 assignments of error, on which it bases 29 propositions of law. These assignments, however, raise only two questions which we deem it necessary to discuss.

Appellant's first proposition is that:

"The court erred in overruling the defendant's motion for an instructed verdict seasonably filed, because the plaintiff wholly failed to sustain the burden imposed by the law under his pleadings of showing by competent evidence that his injury was caused either by a defect in the coupling apparatus on the moving car or by the defendant's failure to meet the requirements of the federal Safety Appliance Act relative thereto."

The portion of what is commonly known as the federal Safety Appliance Act pertinent to the question here raised reads as follows:

"That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." U. S. Comp. St. § 8606.

[1-3] The application of this law in cases of injuries received by employés engaged in the operation of trains generally has been passed upon by both state and federal courts so often that there can be little or no doubt left as to its scope or meaning. Naturally the vast majority of injuries, calling for the application of this law, are to brakemen, members of train crews, or switchmen in yards. So far as we have been able to find, its application to inspectors has never been passed upon. The express language of the statute declares that its purpose was to obviate the necessity of employés going between the ends of cars to couple or uncouple them. It is not sufficient to place automatic couplers on cars, but they must be kept in repair so as to operate successfully. Ry. Co. v. Wagner (Tex. Civ. App.) 166 S. W. 24; Ry. Co. v. Brown, 229 U. S. 317, 33 Sup. Ct. 840, 57 L. Ed. 1204. Nor is the act complied

with if the drawbars are allowed to get out of line to such an extent that the cars will not couple without the necessity of an employé going between the cars to align them. T. & P. Ry. Co. v. Sprole (Tex. Civ. App.) 202 S. W. 985; Ry. Co. v. Powell (Tex. Civ. App.) 252 S. W. 269; Ry. Co. v. Wagner, 241 U. S. 476, 36 Sup. Ct. 626, 60 L. Ed. 1110. Nor is it sufficient to exercise reasonable care in maintaining automatic couplers in an operative condition, but in the event of failure to comply with the federal Safety Appliance Act in keeping them in safe condition the liability of the railway company for injuries resulting therefrom is absolute. C., B. & Q. Ry. Co. v. U. S., 220 U. S. 559, 31 Sup. Ct. 612, 55 L. Ed. 582; Ry. Co. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061. It is also settled that the preparation or alignment of a drawhead preparatory to the impact of the cars constitutes a part of the act of coupling within the meaning of the statute. Ry. Co. v. Sprole (Tex. Civ. App.) 202 S. W. 985.

However, it cannot be said that the act requires the railway company to keep its drawbars in perfect alignment at all times. The drawbars must of necessity have some freedom of action laterally to enable trains to negotiate curves in the track. The law only imposes upon the railway company the duty to keep them in such alignment and so equipped that they will couple automatically without the necessity of any one going between the ends of the cars to effect a coupling, and if it fails to do so, and personal injuries result to those whose duty it is to make the coupling, then the railway company's liability is absolute.

But appellant's contention in the instant case is that the plaintiff failed to discharge the burden cast upon him to show that the railway company had violated the Safety Appliance Act. On this point the evidence was substantially as follows: Plaintiff testified that Brakeman Garrett, as the moving water car approached the standing fruit car, pointed to the drawhead of the standing car; that he (plaintiff) opened the knuckle of the fruit car and tried to push the drawbar over with his hands, but found it tight, and could not do so; that it was out of line towards him, to quote his testimony, "I guess an inch or inch and a half, maybe two inches"; that "the normal play is about an inch and a half on each side." Though he testified that the drawbar on the standing car was out of line enough for him to notice it, on cross-examination he also further testified:

"So far as I know there was no defect in the drawbar; I possibly would not have done anything to the car under my duties as inspector from what I discovered. I expect I would have passed it as being in good order, and let it gone on."

Garrett testified that he did not point to the drawbar on the standing car, and that he saw nothing wrong with it. R. L. Carr, foreman of the mechanical department of appellant at Ft. Stockton, testified by deposition that he examined the drawbars and coupling apparatus of both cars carefully immediately after the accident and found no defects whatever in them, but that they were in perfect condition. It is not controverted that both cars were equipped with automatic couplers. Under the undisputed evidence, therefore, there appears no defect in the coupling apparatus of the standing fruit car at the time, nor was it out of line more than the normal lateral play allowed for curves.

The question is therefore confined to the defect, if any, on the moving or water car which was bumped into it. Plaintiff alleged and testified that the drawbar of the water car was about four inches out of line, away from him, and that the cars would not have coupled had he not placed his foot on the drawbar of the standing car and pushed it over; that the misalignment of the drawbar of the approaching car caused his injury; that if such drawbar had been properly aligned when it bumped into the standing car his foot would not have been caught; and that in the position in which the drawbars were they would not have coupled by impact without the necessity of his going between the cars to effect a coupling. Wood also testified that there was a lever on the standing car for opening the knuckle, and that so far as he knew this was in good order; that when he put his foot on the drawbar of the standing car, which was only slightly out of line towards him, and tight, he pushed it over some, but did not know how much, and when the impact from the moving car came it drew the drawbar of the standing car away from his foot. As to the time he learned that the draw bar of the moving car was out of line we quote his testimony as follows:

"The drawbar on the car they were bringing down to put in the train was about four inches too far from me. I learned that fact at the time the impact was made, and when I saw that I did not have time to remove my foot; my foot had already slipped around there. Up to that time I had no opportunity to observe this moving car and the condition of the drawhead being out of line. * * * Just as they got there I placed my foot against it to line it up, and when it hit it buckled out and took the drawbar away from my foot, and made the coupling on my foot."

[4] The brakeman who was immediately present, having stepped off the moving car only six or eight feet before the impact, and saw the accident, testified that it was not necessary for any one to go between the cars to couple them; that both were equipped with automatic couplers in good order, so far as he could tell; and that Wood just at the instant of impact placed his foot on the drawbar of the moving car, instead of that

of the standing car, and that it slipped off between them and was crushed. R. L. Carr, the foreman, also testified that the drawbars and couplers of both cars were found by him immediately after the accident to be in perfect condition. The cars had not been bumped together before Wood went between them; the brakeman whose duty it was to make the coupling was present and saw nothing requiring one to go between the ends of the cars; they did couple by impact when bumped together, were uncoupled by the brakeman then and there without going between them, and later were again coupled up without difficulty so far as the record shows. Wood's testimony that the drawbar of the standing car was only slightly out of line towards him, that it was tight, and that when the impact came it "took the drawbar away from my foot," strongly indicates that he had not pushed it over prior to the time of the impact. If he had not it is clear that the coupling would have taken place without his going between the cars, and his statement that it was necessary for him to go between the ends of the cars and adjust the drawbar before they would couple resolves itself into an opinion which was contradicted by the facts, because it did couple. In other words, plaintiff's right of recovery on this issue is based upon his opinion formed upon an observation made at the very instant of impact of the cars, and in a time too short for him to remove his foot from the coupler, that the drawbar of the moving car was too far out of line for it to couple, when the physical facts are that it did couple not only then, but thereafter. There is no proof other than this of any defects whatever in the couplers in question, mechanically or otherwise, and nothing to support plaintiff's contention save his own observations and opinion as to what would have happened had he not gone between the cars. This, we think, is leaving the domain of fact and invading the realm of fancy, and is too meager to sustain a recovery against appellant. The burden was upon the plaintiff to show some defect that would constitute a failure to comply with the federal Safety Appliance Act. The fact that Wood went between the cars and was hurt imposes no burden upon appellant unless it was negligent or failed to comply with the law. And, as said in Ry. Co. v. Bounds (Tex. Civ. App.) 244 S. W. 1102:

"It would be manifestly unfair to hold that the carrier had violated the statute until the inefficiency of the device had been disclosed by some reasonable test that would justify the conclusion that it was defective."

See, also, Morris v. Ry. Co. (Tex. Civ. App.) 158 S. W. 1055.

[5] The proof offered was, we think, insufficient as a matter of law to compass a recovery against appellant.

Appellant's third proposition is as follows:

"If the plaintiff had any right of recovery it must necessarily be predicated upon some violation of the federal Safety Appliance Act, because at common law, which would apply in the absence of such statute, he must be held to have assumed all risks and the defendant owed him no duty incident to the testing and repairing of the coupling apparatus in question, and, having failed to adduce any competent evidence of default or failure in the particular named, the court, upon motion seasonably filed, should have either directed a verdict for the defendant, or entered judgment on the jury's verdict on special issue No. 1A."

Wood was employed by appellant as inspector, and went to Ft. Stockton to act in that capacity. A. J. Cleary, superintendent of appellant in Texas, testified as to appellee's duty as follows:

"The duty of an inspector at that time was to see and inspect every car in a train before its departure from terminal point, and see that the safety appliances and equipment complied with the United States Safety Appliance Law."

Wood testified:

"I was the inspector that night. The train got in from Alpine that morning between 5:30 and 6 o'clock; it was late. I was hurt about 6:20 a. m. My regular day's work was ended and my overtime started at 6 o'clock; I had already worked one day and had started on my overtime."

In outlining his duties as inspector, in addition to the other duties, Wood testified as follows:

"If he (the inspector) finds the drawbars out of line, his duty with reference to that is to line them up and fix them as soon as he gets time from the inspection of the train."

[6] There is some question raised as to whether Wood at the time of the injury was acting wholly in his capacity as inspector, or assisting the train crew in the capacity of a brakeman in making the coupling, but his own testimony was that he had not fully completed his inspection of the train, and that at the time his sole and only purpose in making the coupling was to determine if there were any defects in the drawbars, and the jury so found. He must be treated, therefore, as acting wholly in his capacity as inspector at the time the injury occurred.

[7] The question which presents itself, then, is: Even if there was a defect in the coupling apparatus, did the railway company owe the plaintiff, whose duty it was to discover and repair such defect, the duty of meeting the requirements of the safety appliance law? Appellee contends, and cites numerous decisions of the United States Supreme Court in support of his contention, that the duty of a railway company to all its employés to furnish coupling equipment

that complies with the Safety Appliance Act is absolute. So far as operatives of trains are concerned, and those whose employment requires them to use coupling apparatus in the discharge of their duties, this rule is undoubtedly true. But none of the cases cited by appellee involve an inspector injured while inspecting, nor apply to the facts of the instant case. As we understand it, the Safety Appliance Act of Congress was designed and intended primarily to abolish the fellow-servant doctrine, the doctrine of assumed risk, and contributory negligence of the employé as an absolute defense, in the fields covered by the act. We do not understand that it created new liabilities of the master or employer otherwise. In the very nature of things it would be impossible to make the master's duty to all employés absolute under the Safety Appliance Act. The growth and expansion of industry has long since made it impossible for the master to observe or supervise personally either his machinery or his employés. Under modern conditions, in large enterprises, the master can operate only through the agencies, instrumentalities, and employment of large numbers of employés, discharging a wide variety of duties. Necessarily, then, some of them must themselves discharge as to others the functions and responsibilities of the master—must become the alter ego of the master. Clearly, we think, this was the status and function of Wood on the occasion of his injury. The railway company, as master, was charged by law with the duty of furnishing to the public and to those whose duty it was to use them safe coupling devices, and of keeping same in a safe state of repair. It must discharge this duty through some agency or class of employés. This was the purpose for which Wood, as inspector, was employed. It was his duty to see that the law was complied with, both by inspection and by repairing any defects he found. It would be absurd to insist that the company must furnish such employé perfect machinery to repair or faultless apparatus to inspect. Yet such would, in effect, be the result in holding that the inspector comes within the provisions so far as his particular duties are concerned, of the Safety Appliance Act.

"But reason is the life of the law. * * * And nothing, as it is said, is law that is not reason. * * * And by every consideration, the statutes here, the same as in any case, are to have a sensible construction." Siegel v. N. Y. Central Ry. Co. (C. C.) 178 Fed. 873.

Turning aside from the provisions of the federal Safety Appliance Act, we find that as between master and servant it is well settled that employés whose duty it is to inspect and repair necessarily cannot be placed in the same category with other employés whose duties are to use the instrumentalities, machinery, or equipment after same have been inspected and repaired. The reason therefor is well stated in Dartmouth Spinning Co. v. Achord, 84 Ga. 14, 10 S. E. 449, 6 L. R. A. 190, in the following concise language:

"While it is the duty of a master to furnish his servant with safe machinery for use, he is under no duty to furnish his machinist with safe machinery to be repaired, or to keep it safe while repairs are in progress. Precisely because it is unsafe for use, repairs are often necessary. The physician might as well insist on having a well patient to be treated and cured, as the machinist to have sound and safe machinery to be repaired. The plaintiff was called to this machinery as infirm, not as whole. An important part of his business was to diagnose the case, and discover what was the matter. If he failed in this branch of his profession, it was either his fault or his misfortune. So far as appears, no one knew more of the state and condition of the machinery at the time than he did; and the object of calling him in the room was that he might ascertain the cause of the trouble, and apply the remedy. Unfortunately, he exposed himself before becoming fully aware of the extent to which the melting of the babbitt had gone; and it was the want of that information, and not the negligence or incompetency of any one connected with the establishment, which brought about the injury. The incompetency and inattention of the others gave him more to do in his vocation, somewhat as a sickly climate favors a physician's practice."

We also find the following laid down by Judge Street in his work on Personal Injuries (1911 Ed.) p. 226:

"The rule of the master's liability for negligence to servants for defects discoverable by inspection does not, of course, apply to servants charged with the duty of making the inspection. The injury in such case is the result of their own neglect. Nor does the rule of the master's liability for injury resulting from the failure to maintain in safe condition machinery, etc., apply to those servants charged with the duty of making repairs, who are injured by reason of such defect while they are in the course of making the repairs. Such risk is an ordinary risk of the service in which they are employed."

This question is also fully discussed in Magnolia Petroleum Co. v. Ray (Tex. Civ. App.) 187 S. W. 1085. We quote from the opinion in that case the following:

"According to the allegations in plaintiff's petition and the undisputed evidence, plaintiff was employed for the express purpose of inspecting cars in order to determine whether or not they were in a safe condition for use by the company. The evidence further shows that it was within the scope of the duties of plaintiff's employment to remedy any defects in the cars which he might discover upon inspection and which could be repaired by him. Plaintiff's employment necessarily required him to go upon cars that were in an unsafe and dangerous condition, for the purpose of deter-

mining and repairing that condition, and it is well established that the general rule given in the court's charge which requires the master to exercise ordinary care to furnish the servant with a reasonably safe place to work has no application to that character of employment under such circumstances. See S. A. & A. P. Ry. Co. v. Weigers, 22 Tex. Civ. App. 344, 54 S. W. 910; Wells Fargo Express Co. v. Page, 29 Tex. Civ. App. 489, 68 S. W. 528; 3 Labatt's Master and Servant (2d Ed.) §§ 924, 1176, and authorities there cited.

"In Allen v. G., H. & S. A. Ry. Co., 14 Tex. Civ. App. 346, 37 S. W. 171, in which a writ of error was denied by our Supreme Court, the following was said: 'Ordinarily, the master owes his servant the duty of inspection or reasonable care in furnishing him safe and suitable means for performing his work. This rule has no reference to the safety and condition of the thing the servant is employed to repair or complete. As stated in Carlson v. Ry. Co., 21 Or. 450, 28 Pac. 497: "Where a servant is employed to put a thing in a safe and suitable condition for use, it would be unreasonable and inconsistent to require the master to have it in a safe condition and good repair for the purpose of such employment." ' " To the same effect are numerous decisions collated in notes to Forbes v. Gorman, 25 L. R. A. (N. S.) 321.

"In many of the authorities announcing that the general rule requiring a master to furnish a safe place for the servant to work does not apply in such cases it is stated that the servant assumes all such risks. The underlying principle of the exception, as we understand it, is that no negligence can be charged to the master when the servant voluntarily contracts to assume the very risk of which he complains; and, in the absence of negligence on the part of the master, the servant has no cause of action as a matter of course. The use of the expression in the authorities referred to that the servant assumes the risk is misleading, in that the defense of assumption of risk implies negligence on the part of the master creating liability for the damages sustained, unless such a right of action is destroyed by that defense. It is important to keep this distinction in mind, if the common-law rule of allowing the defense of assumed risk where the master has been guilty of negligence is changed by statute, as has been done in this state, and if that statute applies in the present suit. If there has been no negligence on the part of the master, then the defense of assumed risk has no place in the case."

This case has been followed and approved in Haney v. T. & P. Coal Co. (Tex. Civ. App.) 207 S. W. 380; Ry. Co. v. Clement (Tex. Civ. App.) 220 S. W. 407; Id. (Tex. Com. App.) 236 S. W. 714.

[8] Thus it appears that under the common law an inspector whose duty it was to inspect and repair appliances could not recover for injuries suffered in the course of such employment. Nor do we think it was the purpose of Congress to create any such new liability as to such an employé in the passage of the Safety Appliance Act. As to such an employé the risks of injury are ordinary, and such as are necessarily involved in the very nature of his employment. To seek out and remedy defects which the law prescribes must not be allowed to exist is the very thing he is employed and paid to do, and it would be paradoxical to say that the master must furnish him perfect equipment to inspect and repair.

Though we are of the opinion that there was not sufficient proof as a matter of law to sustain a finding that the railway company was guilty of violating the Safety Appliance Act, even if there were, we are of the opinion that the appellant owed him as its inspector, and whose duty it was to repair any defect found in the coupler, no such duty as would make it liable, under the Safety Appliance Act, for the injuries sustained by him. For this reason it becomes necessary for us to reverse the judgment of the trial court and render judgment for the appellant.

Reversed and rendered.