**Florence METCALFE, Administratrix of the Estate of John E. Metcalfe, Deceased, Plaintiff-Appellee,**

v.

**The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a corporation, Defendant-Appellant.**

**No. 73–1481.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Oct. 15, 1973.

Decided Feb. 5, 1974.

Rehearing Denied Feb. 28, 1974.

894

———◆———

Peter J. Crouse, of Grant, Shafroth, Toll & McHendrie, Denver, Colo., for defendant-appellant.

Daniel D. Sawyer, of Hubbell, Lane & Sawyer, Kansas City, Mo., for plaintiff-appellee.

Before HILL and BARRETT, Circuit Judges, and SMITH, Senior District Judge[*].

TALBOT SMITH, Senior District Judge.

The present action was instituted in the United States District Court for the District of Colorado by Florence Metcalfe, widow of John E. Metcalfe and administratrix of his estate, against the appellant, Atchison, Topeka and Santa Fe Railway Company, to recover damages under the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq., for a violation of the Safety Appliance Act, 45 U.S.C. § 1 et seq., which allegedly contributed to the injury and death of her husband. The jury returned a verdict in favor of appellee in the sum of $107,000 plus costs. From the judgment entered on the verdict and the order of the district court denying its motion for judgment notwithstanding the verdict or for a new trial, the Railroad appeals.

The principal question presented for review is whether there was sufficient evidence to support the jury's findings that the Railroad violated § 2 of the Safety Appliance Act and that this violation was a cause, in whole or in part, of the injury and death of Metcalfe. Additionally, the Railroad attacks the jury's award of damages as excessive.

On July 30, 1970, before dawn, Metcalfe was working in the Railroad's Colorado Springs yards as foreman of a switch crew, a position he had held for eighteen years. The crew had coupled onto the front end of the switch engine, heading north on the team track, which runs generally north and south, a piggyback car. The ultimate objective was to back the engine and the piggyback car to the south on the team track until reaching the wye track which, roughly speaking, forms a triangle to the west with the hypotenuse of the team track, and to proceed down the north leg of the wye track, eventually pushing the piggyback car onto the south leg of the wye track and thereby turning it around. En route to the wye track, a box car was coupled to the north end of the piggyback car. So constituted, the train continued backing until the engine and most of the piggyback car were situated on the north leg of the wye track. At this point Metcalfe informed his switchman helper, Dwight Fields, that they would uncouple the box car and leave it stationary on the team track. Fields was positioned ten to twenty feet east of the train so as to pass signals around the curve from Metcalfe to the engineer. By means of a lever on the east side of the piggyback car, and without going

* Honorable Talbot Smith, United States Senior District Judge, Eastern District of Michigan, sitting by designation.

between the ends of the cars, Metcalfe uncoupled the piggyback car and the box car. Having done so, he gave a back-up signal to Fields, and, after the engine and piggyback car had moved ten to twenty feet to the southwest, a stop signal. Then Metcalfe stepped between the cars and, facing north, opened the knuckle on the box car. Fields meanwhile had taken four or five steps towards the front of the train before glancing back at Metcalfe. Metcalfe was standing between the piggyback car and the box car and facing south or southeast. As Fields watched, he "dropped straight down out of sight." Fields, as yet not alarmed, walked back to where Metcalfe had disappeared from view and found him pinned beneath the southeast wheel of the box car, six to fifteen feet north of the piggyback car.

After the arrival of an ambulance, it was decided to recouple the piggyback car and box car in order to move the box car northward and free of Metcalfe's body. At this time it was noticed that the drawbar on the coupler of the piggyback car was slanted toward the east to such an extent that it was necessary to realign it, going between the cars to do so, in order to make the coupling.

Appellee claims that the jury was entitled to infer from these facts that Metcalfe, after he had opened the knuckle on the box car, noticed the misaligned drawbar on the piggyback car and was proceeding to adjust it when the box car moved southward, crushing him under one of its wheels. The necessity of going between the cars to adjust a misaligned coupler, according to appellee, constitutes a violation of § 2 of the Safety Appliance Act. The Railroad, in turn, contends that there is insufficient evidence that Metcalfe was between the cars for any purpose other than opening the knuckle on the box car and that, even if Metcalfe was proceeding to adjust the coupler, such action was premature. It is the Railroad's position that the sole cause of the accident was Metcalfe's negligence in stepping in front of

the box car to open the knuckle without having chocked the wheels or set the brakes in a manner sufficient to prevent the box car from rolling.

The Federal Safety Appliance Act, adopted in 1893, forced the railroads to install appliances designed to eliminate some of the more hazardous aspects of railroad work. The Act did not, of itself, create a federal cause of action imposing civil liability upon the railroads for violations. Rather, it imposed sanctions in the form of monetary penalties. In 1908, however, Congress, via the Federal Employers' Liability Act [FELA], provided railroad employees with a cause of action based on violations of the Safety Appliance Act. 45 U.S.C. § 51. The peculiar characteristics of this newly-created cause of action were described by Mr. Justice Brennan in Crane v. Cedar Rapids & I. C. R. R., 395 U.S. 164, 89 S.Ct. 1706, 23 L.Ed.2d 176 (1969), as follows:

"In such actions, the injured employee [or his or her personal representative in case of death] is required to prove only the statutory violation and thus is relieved of the burden of proving negligence. . . . He is not required to prove common-law proximate causation but only that his injury resulted 'in whole or in part' from the railroad's violation of the Act, . . . and the railroad is deprived of the defenses of contributory negligence and assumption of risk . . . ." (citations omitted) 359 U.S. at 166, 89 S.Ct. at 1708.

The standard applied by federal courts in determining whether there is sufficient evidence to send a FELA case to the jury is significantly broader than the standard applied in common law negligence actions. As stated by the United States Supreme Court in Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L. Ed. 916 (1946), "Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear." See Rogers v. Missouri Pac. R. R., 352 U.S. 500, 77 S.

Ct. 443, 1 L.Ed.2d 493 (1957); Missouri-Kansas-Texas Ry. v. Hearson, 422 F.2d 1037 (10th Cir. 1970); Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969); Chicago R.I. & P.R.R. v. Melcher, 333 F.2d 996 (8th Cir. 1964); Prosser, Torts § 80, p. 536 (4th ed. 1971). To this standard, however, must be added the admonition found in Tennant v. Peoria & P.U. Ry., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 (1944): "The essential requirement is that mere speculation be not allowed to do duty for probative facts after making due allowance for all reasonably possible inferences favoring the party whose case is attacked." *See* Missouri-Kansas-Texas Ry. v. Hearson, *supra*, 422 F.2d at 1041.

As already noted, appellee alleged that the Railroad violated § 2 of the Safety Appliance Act, 45 U.S.C. § 2, in that the coupler of the piggyback car was misaligned to such an extent as to preclude coupling automatically by impact.

Section 2 reads:

It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.

There is no dispute but that all of the Railroad's cars are equipped with "automatic couplers" in the sense that the cars can ordinarily be coupled together without men going between the ends of the cars.[1] The coupling apparatus, however, permits limited movement of the drawbar from side to side in order to allow the cars, when coupled together, to pass around curves without derailment and to allow coupling on a curve. In some cases, the drawbar may move so far off-center as to preclude automatic coupling. In such cases, it is necessary to go between the cars to adjust the drawbar.

A substantial number of state and federal courts have found that a failure to couple automatically because of a misaligned drawbar is sufficient to sustain a finding that § 2 has been violated.[2] San Antonio & A. P. Ry. v. Wagner, 241 U.S. 476, 36 S.Ct. 626, 60 L.Ed. 1110 (1916); Atlantic City R. R. v. Parker, 242 U.S. 56, 37 S.Ct. 69, 61 L.Ed. 150 (1916); Kansas City S. Ry. v. Cagle, 229 F.2d 12 (10th Cir. 1955), cert. denied, 351 U.S. 908, 76 S.Ct. 697, 100 L.Ed. 1443 (1956); Chicago, St. P., M. & O. Ry. v. Muldowney, 130 F.2d 971 (8th Cir.), cert. denied, 317 U.S. 700, 63 S.Ct. 526, 87 L.Ed. 560 (1942); Hampton v. Des Moines & Cent. I. R. R., 65 F.2d 899 (8th Cir. 1933); Hohenleitner v. Southern Pac. Co., 177 F. 796 (C.C.D.Or. 1910); Finley v. Southern Pac. Co., 179 Cal.App.2d 424, 3 Cal.Rptr. 895 (1960);

---

1. For a detailed description of couplers, see McGowan v. Denver & R.G.W.R.R., 121 Utah 587, 244 P.2d 628, 630 n. 2, cert. denied, 344 U.S. 918, 73 S.Ct. 346, 97 L.Ed. 707 (1952).

2. The General Foreman of the Car Department of the Railroad, J. D. Martin, testified that automatic *realigning*, as opposed to automatic *coupling*, devices are still in the experimental stages, and have been installed on less than one per cent of railroad cars. He also testified that the Railroad has never received a citation for violation of the Safety Appliance Act from the Department of Transportation for failure to equip its cars with automatic religning devices.

The record is unclear as to the current state of automatic realigning devices throughout the entire railroad industry. Nor is it clear what other alternatives there may be to sending railroad employees between the ends of the cars to adjust misaligned couplers. Nevertheless, as has been repeatedly emphasized by the courts, "The ultimate end sought by the [Safety Appliance Act] is the coupling and uncoupling of cars used in interstate traffic without the necessity of going between them." Hohenleitner v. Southern Pac. Co., 177 F. 796 (C.C.D.Or.1910). The obligations imposed upon the railroads by the Act are "absolute . . .," not based upon negligence." Carter v. Atlanta & St. A.B. Ry., 338 U.S. 430, 434, 70 S.Ct. 226, 94 L.Ed.2d 236 (1949).

Hallada v. Great Northern Ry., 244 Minn. 81, 69 N.W.2d 673, cert. denied, 350 U.S. 874, 76 S.Ct. 119, 100 L.Ed. 773 (1955); White v. Atchison, T. & S. F. Ry., 244 S.W.2d 26 (Mo.1951), cert. denied, 343 U.S. 915, 72 S.Ct. 648, 96 L. Ed. 1330 (1952); Chicago, R. I. & P. Ry. v. Ray, 67 Okl. 77, 168 P. 999 (1917), cert. denied, 246 U.S. 662, 38 S. Ct. 332, 62 L.Ed. 927 (1918); Kansas City, M. & O. Ry. v. Wood, 262 S.W. 520 (Tex.Civ.App.1924); McGowan v. Denver & R. G. W. R. R., 121 Utah 587, 244 P.2d 628, cert. denied, 344 U.S. 918, 73 S.Ct. 346, 97 L.Ed. 707 (1952).

The Railroad vigorously argues, however, that the fact that the drawbar on the piggyback car had to be realigned before it would couple with the box car does not establish that the piggyback car would not have automatically coupled, misaligned drawbar and all, with whatever car with which it would eventually have been coupled, but for the intervenimg accident. Similarly, the Railroad suggests that even if Metcalfe was attempting to realign the drawbar, such action was premature until it was determined with which car the piggyback car would be coupled and whether realignment would be necessary under the circumstances.

The Railroad's argument ignores, however, evidence from which the jury was entitled to infer that the piggyback car would not have successfully automatically coupled with *any* car without realignment of the drawbar. In reviewing the sufficiency of the evidence to support the jury verdict for appellee, of course, we must resolve all conflicts against appellant, and award appellee the benefit of such favorable inferences as the jury might reasonably have drawn. Chicago, St. P., M. & O. Ry. v. Muldowney, *supra*, 130 F.2d at 973.

According to Swede Nelson, the brakeman who adjusted the drawbar on the piggyback car before recoupling the piggyback into the box car, the drawbar on the former was out of line "to the ex-treme east." In Hampton v. Des Moines & Cent. I. R. R., *supra*, 65 F.2d at 901, testimony that the drawbar was four or five inches out of line and that the drawbar would not couple on impact in that position "constituted substantial evidence that the coupler was defective." See Geraghty v. Lehigh Valley, R. R., 70 F.2d at 303; White v. Atchison, T. & S. F. Ry., *supra*, 244 S.W.2d at 29–30. We find that the jury, or for that matter, Metcalfe, could have reasonably concluded that a drawbar misaligned "to the extreme east" would not couple on impact, particularly in view of the practice of the Railroad, as testified to by several of its employees, of keeping drawbars centrally aligned at all times, and of coupling on a straight track as opposed to a curved track whenever feasible.

Having determined the existence of probative facts to support the finding of the jury that § 2 was violated, we turn to the question of the sufficiency of the evidence to support a causal connection between the statutory violation and Metcalfe's injury and death.

The quantum of evidence necessary to prove a causal connection in an FELA case was carefully considered in Rogers v. Missouri Pac. R. R., *supra*, Mr. Justice Brennan stating:

"Under this statute [FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence [or employer violation of the safety-appliance statutes]* played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence." 352 U.S. at 506, 77 S.Ct. at 448.

See Missouri-Kansas-Texas Ry. v. Hearson, *supra*; Lane v. Gorman, 347 F.2d 332 (10th Cir. 1965).

---

* Bracketed material ours. See Coray v. Southern Pacific Co., 335 U.S. 520, 69 S.Ct. 275, 93 L.Ed. 208 (1949).

Applying this test to the facts of the present case, we must agree with the trial court that appellee provided sufficient proof to sustain the finding of the jury that the statutory violation on the part of the Railroad contributed in some degree to Metcalfe's injury and death. Metcalfe faced north to open the knuckle on the box car. When Fields glanced back at him, Metcalfe was facing south or southeast, a position consistent with appellee's theory that Metcalfe intended to realign the drawbar on the piggyback car. It is clear that it was Metcalfe's duty to realign drawbars when they moved so far out of line as to prevent coupling. The engineer of the train, Thomas Brooke, testified that although he had moved the train approximately twenty feet to the southwest, Metcalfe was found only twelve feet north of the piggyback car, permitting the inference that Metcalfe had walked some distance in the direction of the piggyback. In Geraghty v. Lehigh Valley R. R., *supra*, the sole fact that a railroad employee had stepped between the cars "as [if] to adjust a coupling" was held sufficient to support a causal connection between a defective coupler and the railroad employee's injury and death. See Chicago, R. I. & P. Ry. v. Ray, *supra*; *cf.* Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946); Tennant v. Peoria & P. U. Ry., *supra*, 321 U.S. at 35, 64 S. Ct. 409, 88 L.Ed. 520.

Language in Tennant v. Peoria & P. U. Ry., *supra*, appropriately summarizes our reasons for refusing to disturb the present verdict:

"The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weights the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers the most reasonable. * * * That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions . . . ." 321 U.S. at 35, 64 S.Ct. at 412.

Finally, the Railroad asserts that the verdict was so excessive as to suggest that it was the result of passion or prejudice on the part of the jury. We do not agree.

■ It is the well-settled rule in this circuit that "absent an award so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the fact is considered inviolate." Barnes v. Smith, 305 F.2d 226 (10th Cir. 1962). *See* Brown v. Richard H. Wacholz, Inc., 467 F.2d 18 (10th Cir. 1972); Ketchum v. Nall, 425 F.2d 242 (10th Cir. 1970); Lane v. Gorman, *supra*, 347 F.2d at 335.

■ Under FELA, appellee was entitled to recover four separate items of damages: 1) the present value of financial contributions which the decedent would reasonably be expected to have given his wife and son had he lived; 2) the pecuniary value of services which his wife might reasonably have expected to receive from him in the future; 3) loss to the son during his minority of the training, nurture, education and guidance of his father; and 4) conscious pain and suffering of the decedent prior to death. *See* DeParq & Wright, Damages Under the Federal Employers' Liability Act, 17 Ohio St.L.J. 430 (1956).

The jury's verdict of $107,000 was a general one, so we have no way of knowing the specific amount allocated to each item. Nevertheless, the award as a

whole falls well within the perimeters of reasonableness in this case. Appellee's actuary computed the present worth of future contributions as $79,179.11. Metcalfe performed extensive services for his wife, including painting, carpentry, plumbing, gardening and caring for the family automobiles. He participated actively with his son in sports, school, church and 4-H activities. As to the pain and suffering he endured before his death, there was evidence that he remained conscious for at least fifteen minutes following the accident.

The Railroad raises two specific objections to appellee's evidence on damages: 1) that Mrs. Metcalfe overestimated her husband's actual monthly take-home pay and 2) that future contributions were computed until Metcalfe would have reached retirement age instead of over his work-life expectancy.

According to the records of the Railroad, Metcalfe earned gross wages of $9,329.27 in 1969. Mrs. Metcalfe supplied an actuary with information from which he calculated that 59.95% of Metcalfe's wages in 1969 had been contributed to his family. Regardless of any discrepancy between the information supplied by Mrs. Metcalf and a bank deposit slip introduced into evidence by the Railroad, we think the jury was entitled to adopt the actuary's calculations. As testified to by several witnesses, Metcalfe was a singularly generous and unselfish husband and father.

Appellee's actuary computed the loss of future contributions over a nine year period—until Metcalfe would have attained customary retirement age. The Railroad argues that the loss should have been measured over Metcalfe's work-life expectancy, 7.92 years. We agree, however, with those authorities which take the position that work expectancy is just one more factor to be taken into consideration in determining what the decedent could have expected to earn in the future. See DePraq &

Wright, *supra*, at 455; S. Speiser, Recovery for Wrongful Death § 3.14 (1966). The trial judge so instructed the jury.

Judgment affirmed.