**LOWDEN et al. v. BURKE.**

No. 12009.

Circuit Court of Appeals, Eighth Circuit.

July 27, 1942.

Rehearing Denied Aug. 14, 1942.

Philip Stringer, of St. Paul, Minn.. (E. S. Stringer and John D. Stringer, both of St. Paul, Minn., on the brief), for appellants.

William H. DeParcq, of Minneapolis, Minn. (Mr. Eugene A. Rerat, of Minneapolis, Minn., on the brief), for appellee.

Before STONE, THOMAS, and JOHNSEN, Circuit Judges.

STONE, Circuit Judge.

This is an action (under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq.) by an administratrix for the death of William T. Burke. From a recovered judgment, defendants appeal.

For many years, Burke had been employed in and about the yards of defendants at Chickasha, Oklahoma. For some time before his death, his duties were various, including car repairs. On the morning of September 27, 1939, Burke was under a box car on track 6 in that yard removing a brake beam therefrom. While so engaged, a string of cars was switched onto the track resulting in the movement of this car whereby Burke was killed.

Defendants (appellants) present here the one main issue of the sufficiency of the evidence to justify submission to the jury. This broad issue narrows to a controversy as to whether Burke complied with a company rule requiring display of a "blue flag" as a warning that work was being done on the car and, therefore, that it should not be moved. This Rule 26 is as follows:

"A blue flag by day and a blue light by night, displayed at one or both ends of an engine, car or train, indicates that workmen are under or about it. When thus protected it must not be coupled to or moved, nor other cars or engines placed on the same track so as to intercept the view of the blue signals. Workmen will display

the blue signals and the same workmen are alone authorized to remove them. See Rule 702e."[1]

The positions of the parties as to this issue of fact are as follows. Plaintiff contends a blue flag was displayed in a proper place on the car where Burke was working and that this was a compliance with the Rule. Defendants contend that no flag was displayed; and, even if one was displayed on this car, that display thereon was, in the situation here, no compliance with the Rule. It thus appears that these contentions present two matters: (1) was a blue flag displayed on this car; and (2), if so, was this a compliance with the Rule?

■ Before examining, separately, the testimony as to each of these matters, it is helpful to state something of the fact situation into which these two matters fit. While there is much conflict in the evidence as to many matters, we must consider the evidence most favorable to plaintiff.

This yard runs north and south. The main line track runs just east of the station platform (which is at the west side of the yards) and the "passing" track is parallel thereto and just east thereof. Branching off easterly from the passing track are two lead or ladder tracks, one at each end of the yard, which connect, by switches, seven switch tracks to the passing track and to each other. These leads are approximately straight and cut the ends of the switch tracks at acute angles easterly from the north and south, respectively. The switch tracks are numbered 1 to 7 from west to east.[2] These lead tracks are 3,800 feet apart at the points where they leave the passing track. These seven tracks run parallel north and south and are between nine and ten feet apart. West of all of the above tracks was a round house, a tool house, a store room and other structures, all south from the station building.

For three years before and at the time of this occurrence, an electric switch engine had been and was being used for switching in this yard. It operated with a crew of four men who, at the time here, were the engineer (Griffin), two switchmen (White and Walker) and a crew foreman (Prim). There was no yardmaster but Prim, acting as such, controlled the switching operations except that he obeyed instructions from the station agent (Nugent) or the chief yard clerk (Spearing) as to not switching cars on a particular track until they notified him otherwise. Most of the switching was done at the north end of the yard using the north lead track.

Burke had been with this railroad for thirty-two years in different capacities. At the time of this occurrence, his duties were various including storekeeper, roundhouse hostler and repair man. As repair man, he did light repairs, including taking off and putting on brake beams. On this morning, a defective brake beam was discovered on the tender of an engine which Burke was moving from the roundhouse to take out a local freight train that had been assembled in the yard. Burke went to the store house to get a brake beam but not finding the proper kind there, returned to the engine and stated, to the fireman (Nabors) of the engine, "I will have to take one off a car." While the fireman was taking off the defective beam from the engine, Burke went to a car on track 6. While under this car taking off a brake beam, cars were switched on to track 6 from the north lead, causing this car to move and killing him.

I.  Was a Blue Flag Displayed?

As to this issue, plaintiff contends a blue flag was displayed at the northeast corner of the car under which Burke was working. Defendants contend there was no blue flag there at all. There was no witness who noticed this car after Burke reached it until shortly after the accident. The evidence as to there being a flag there at all and as to its being on this car is entirely circumstantial. The evidence most favorable to plaintiff as to both of these matters is as follows. Burke was a long-experienced and careful man who had never been connected with any accident during his thirty-two years of service. He had often removed and placed brake beams. He knew of Rule 26 and used a blue flag when performing duties involving brake beams. The flag he ordinarily used was

---

[1] It is not contended that Rule 702e, referred to in Rule 26, has any importance here.

[2] Track 1 is not connected directly with the passing track at the north end. It runs from the south connection to near the southern end of a brick platform (on the east side of the passing track opposite the station) where it is connected to the passing track and to track 2 by a cross switch track.

kept in the store room which he used as his office. The late afternoon before the accident, he had gone to a neighboring town to replace a defective brake beam, taking a beam and this flag with him in his automobile. When he returned about dark, he replaced the flag in the store room and locked the door. If anyone had had occasion to protect a car during the night, a blue lantern and not a blue flag would have been used. Burke worked in the day and Harry D. Malone at night. The accident happened about ten o'clock in the morning. That afternoon when the store room was unlocked (with keys taken from the pocket of Burke after the accident) there was no blue flag there.

Before Burke's body was taken from under the car (which was less than thirty minutes after discovery of it), a blue flag was seen by one witness (Wallace) lying on the ground forty or fifty feet north of the body and about two or two and one-half feet east of the east rail of track 6. Shortly after the accident, a blue flag was seen by another witness (Richie) lying on the ground about twenty feet east of track 7 and some distance northerly from a place opposite the accident—this flag was about 355 feet northeasterly from the place of accident. This witness was not certain as to how long after the accident he had seen this flag beyond that it was not over three days. He testified that Mrs. Wallace (the daughter of Burke) was the first person he told about seeing the flag. Mrs. Wallace testified Richie came to Burke's home the afternoon of the day of the accident to see her mother (Mrs. Burke) who was not there at the time and that he then told her about the flag. He returned the following afternoon and told Mrs. Burke about the flag. Mrs. Burke testified she had no thought of a law suit and made no investigation immediately after the accident; and she did not consult an attorney until the Spring of the next year (1940). About the last of February or in March, 1940, Mrs. Wallace had Richie show her where this flag was lying—it was still there. The next day, she showed her husband the flag on the ground and he took a picture of it. Later in March, Mrs. Burke, Mr. and Mrs. Wal-lace and a Mr. Spinning (who went at the request of Wallace) went to the place where the flag was lying, took it up and delivered it to Mr. Nugent at the station building. This flag is exhibit L. Exhibit L is a metal flag (10 x 20 inches) attached to a metal standard of strong strap steel (21 inches long by an inch wide). The top of the standard is bent into a hook away from the flag; and, shortly below the flag, a similar piece of strap steel is bolted to the standard to form (with the lower part of the standard) a slot something over seven inches long. The flag is painted blue with the word "Stop" in large white letters on each side of the flag.[3] This flag was rusted more on the side which had lain near the ground than on the other side. The condition of the vegetation under the flag showed it had lain there sometime before its removal, the latter part of March, 1940. The place where the flag was found was where weeds would grow in season. If a switch crew should run through a blue flag and cause injury, the probable result would be discharge of the switch crew man responsible for the violation of the Rule and might involve the entire switch crew. There was testimony that a railroad man had said that if a crew had run through a blue flag they would "probably" seek to destroy evidence thereof. This flag was similar to the one used by Burke and kept in the storeroom. If the impact of the other cars against this car was sufficiently severe, a flag in place on the car ladder might be dislodged. This car had been moved about half a car length (20 feet) by the impact of the other cars. This car had stood alone on this track for at least a day and was between 250 and 300 feet from any other car when Burke went to it to remove the brake beam.

The result of all of this evidence is to justify a finding by the jury that Burke placed a blue flag on the ladder at the northeast corner of this car before he went to work on the car.

The effect of the above circumstantial evidence is as follows. The evidence that a blue flag was seen shortly after the accident near where the northeast corner

---

[3] This form of flag is designed to hang on the ladder rungs on a freight car. The slot slips over one rung and the hook hangs on the next higher rung. Ladders are placed at the same places on cars. If a car is north and south, the side ladders would be near the northeast and the southwest corners of the car.

of this car was before the accident and that this car was several hundred feet from any other car is evidence that a blue flag was being used by Burke in connection with his work on this car. The evidence that Burke was a careful, experienced man; that a blue flag was placed in the usual place in the store room by Burke the evening before; that it was not there when the storeroom was unlocked the afternoon of the day of accident; that Burke alone did this kind of work in the daytime; that a blue light (not a flag) would be used at night; that the store room was locked; that Burke had the keys thereto in his pocket when killed; that this accident happened in the forenoon (shortly before ten o'clock); and that Burke was apparently engaged in work not requiring a blue flag earlier that morning, is evidence that Burke took this blue flag from the store room with him for this job and that the flag seen shortly after the accident was that flag. The evidence as to this flag (from its construction) being designed to hook upon the ladder of a car and not to be stuck into the ground; as to the location of the flag seen shortly after the accident; as to Burke being a careful, experienced man; as to the possibility of a flag being jarred from a car ladder by severe impact; and as to severity of the impact against this car (shown by its movement by half a car length) is evidence that the flag seen shortly after the accident had been placed by Burke on the ladder at the northeast corner of this car before he went under the car and was there until displaced by the shock of the switching movement which caused his death. The unexplained disappearance of this flag from the place where it was seen shortly after the accident; the finding of a similar flag in the weeds not far from this accident not later than three days after the accident; the subsequent identification of exhibit L as this flag, is evidence that exhibit L is the flag used by Burke.

Defendants contend, that to establish the facts that Burke had a blue flag or placed a blue flag on this ladder of the car before he went to work, require a pyramiding of inference upon inference and that such cannot be done. Whatever may be the limitations of the rule of law thus invoked, the rule is not applicable here. While establishment of the facts here involve somewhat a chain of events, yet the evidentiary facts variously are proper bases to establish each necessary link in the entire chain and fit those links together in a logical manner. Also, the evidence leaves no room for but one logical conclusion. It would be unreasonable to believe that a careful, experienced workman would take this flag with him for the sole purpose of protection and then not place it on some car. The location of the flag, when first seen after the accident, identifies the only ladder on the car where it could have been placed by him.

## II. Compliance with the Rule.

This issue is not concerned with the position of the flag on this car—concededly, the northeast ladder was the proper position—but the contention is that the flag should have been placed on some other of the cars which were standing on the same track north of this car in order to comply with Rule 26. This involves construction of the Rule; and application of the Rule, so construed, to the fact situation here.

█ The broad purpose of the Rule is to protect men working "under or about" an engine, car, or train from movement of that engine, car, or train while they are so engaged. Accomplishment of this purpose is sought by display of a blue flag, which is a warning to others that men are working there and that such movement must be prevented. The place for display of the flag is stated to be "at one or both ends of an engine, car or train" which is being worked on.[4] Clearly, this requirement covers expressly the three situations where an engine is standing alone; where a car is standing alone; and where cars are joined together forming a train. Just when an engine or a car is to be regarded as standing alone so that placing a flag thereon would be compliance with the Rule is not expressed in the Rule. But this Rule deals with protection of limb and life and requires reasonable action, in view of the actual situation, to afford such protection. General considerations affecting this reasonableness are that the workman displaying the sign is protecting a particular engine or car and not interfering with other operations except as they may affect move-

---

[4] There is no contention that use of two flags here on opposite ends was required or could have affected occurrence of this accident.

ment of that engine or car; that those moving standing cars must be on watch for such signals; that the workman has a right to rely upon such watchfulness; and the other operators have a right to expect the display of the signal where it will reasonably inform them of location of a protected engine or car. The factual situations have innumerable possibilities, hence compliance with the Rule gets down to what is reasonably necessary to afford the protection of the Rule in the particular fact situation involved. Such character of question is one of fact for a jury unless the situation happens to be so clear that reasonable men could not differ as to compliance with or violation of the Rule. Therefore, our problem is whether the factual situation here so clearly establishes that placing the flag on this car was no compliance with the Rule that there was no substantial evidence to the contrary to submit to the jury.

This was an empty box car standing on track 6 about 1,255 feet from the track 6 switch of the north lead and about 1,650 feet from the track 6 switch of the south lead. There was nothing on this track south of this car clear to the south lead. Several hours before Burke went to this car, twelve cars had been switched on to this track from the north and were standing there when he went to this car. Eleven of these were empty box cars coupled together. Between this string of cars and this car was an open space of 250 to 300 feet. The twelfth car was a loaded coal car. This coal car was standing alone about 80 to 120 feet north of the string of cars and about 240 to 320 feet south of the track 6 switch on the north lead.[5] There were scattered freight cars on other tracks (2, 3, 4 and 5) toward the north end of the yard—there is no definite location of these cars or their number. Most of the switching in this yard was from the north lead and in the northern part of the yard. All of these cars were on a straight line track there. The proper place for display of a blue flag would have been on the east side, irrespective of the particular car upon which it was placed, and there would be the place to look for it. Had anyone moving cars onto track 6 from the north lead taken three or four steps from that switch, he could have looked along the entire east side of all of the cars on track 6 and have seen a blue flag displayed on any of them. Before this car (where Burke was) could be moved from the north, it would be necessary to come onto track 6, cover the space to the solitary coal car, move that car over the space to the string of eleven empty box cars, and move all twelve cars over the space of 250 to 300 feet to the car where Burke was.

In this fact situation, we cannot say that the placing of the flag in proper place on this car was so clearly a violation of the Rule that the case should not have been submitted to the jury.

The judgment must be and is affirmed.

---

[5] The distance of this car (where Burke was working) from the track 6 switch on the north lead is measured and is 1,255 feet. The other distances are estimates by witnesses who saw the cars on track 6 before the accident. If the maximum figures from these estimates are accepted, they account for 1,220 feet which is practically the measured distance of 1,255 feet between the car, where Burke was working, and the track 6 switch of the north lead. Those maximum distances are as follows: Space from track 6 north lead to coal car 320 feet, length of coal car 40 feet, space between coal car and string of eleven empty box cars 120 feet, length of these 11 cars 440 feet, space between the string of cars and the car, where Burke was working, 300 feet. However accurate or not these spacings (separating the coal car and the string of cars and separating the string of cars from the accident car) may be, the important considerations are that they existed, were appreciable and the space from the accident car was practically an ordinary city block.