CHICAGO, ST. P., M. and O. RY. CO. v. MULDOWNEY.

No. 12285.

Circuit Court of Appeals, Eighth Circuit.

Oct. 26, 1942.

Rehearing Denied Nov. 14, 1942.

Warren Newcome, of St. Paul, Minn. (Alfred E. Rietz, of St. Paul, Minn., and William T. Faricy and Nelson J. Wilcox, both of Chicago, Ill., on the brief), for appellant.

Charles E. Carlson, of Minneapolis, Minn. (Eugene A. Rerat and Walter J. Welch, both of Minneapolis, Minn., on the brief), for appellee.

Before GARDNER, WOODROUGH, and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

Appellee as plaintiff brought this action against appellant to recover damages for the death of Harry Muldowney, who at the time of the accident resulting in his death was in the employ of appellant as a switchman. The parties will be referred to as they were designated in the trial court. The action is brought under the Safety Appliance Act, 45 U.S.C.A. § 2, and Federal Employers' Liability Act, 45 U.S.C.A. § 51.

It is admitted that at the time of the accident resulting in Muldowney's death, both he and the defendant were engaged in interstate transportation. The controlling issues submitted to the jury were whether at the time of the accident defendant, a common carrier engaged in interstate commerce by railroad, violated the Safety Appliance Act by hauling and using on its line a car and tender not equipped with couplers coupling automatically by impact, and whether such alleged violation was the proximate cause of Muldowney's death. Both of these issues were determined by the jury in favor of the plaintiff, the jury returning a general verdict in her favor for $17,552.00, upon which verdict judgment was entered.

On this appeal defendant seeks reversal on substantially the following grounds: (1) the court erred in denying defendant's motion for a directed verdict because there was no substantial evidence of negligence or proximate cause; (2) the court erred in admitting opinion testimony of the witness Welton; (3) the court erred in refusing to give requested instructions and in giving instructions on its own motion.

At the close of all the evidence defendant moved for a directed verdict and the denial of that motion raises here the question of the sufficiency of the evidence. As the jury found all the issues in favor of the plaintiff, all conflicts in the evidence must be resolved against defendant and plaintiff is entitled to the benefit of such favorable inferences as the jury might reasonably have drawn from the evidence. Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Chicago, M., St. P. & P. R. Co. v. Linehan, 8 Cir., 66 F.2d 373; Thomson v. Boles, 8 Cir., 123 F.2d 487. If, when so viewed, the evidence is such that reasonable men might differ as to the existence of facts established or as to reasonable conclusions and inferences that are to be drawn from the conceded facts, the case should be submitted to the jury. Under this rule, the jury, from the evidence, might reasonably have found the following facts:

Muldowney had been employed by the defendant as a switchman for upwards of twenty years. On the morning of March 6, 1941, he was so employed in defendant's Sioux City, Iowa, yard. Train No. 41 arrived in the Sioux City yard from Omaha, Nebraska, on the early morning of March 6, 1941. It was standing on the northbound main line tracks adjacent to and west of the Twenty-second Street yard office, the yard office being approximately a block from Twenty-second Street. It was still dark. Muldowney was a member of a switching crew engaged in breaking up this freight train. Immediately following the arrival of the train, two inspectors, one walking along each side of the train from the caboose forward, looked over the equipment for the purpose of finding out if "anything is loose, broken or dragging along the train from the bolts to the wheels." After this superficial inspection, the switching crew took out one cut of cars for switching purposes. It then took out a second cut of cars, including a Swift & Company refrigerator car No. 18589. This Swift car, together with three other cars, following a switching movement, was "kicked" back to the train so that the Swift car was then standing on the southerly end of the remaining portion of the train as it stood on this north bound main track. Then the switch engine Muldowney was riding backed up, moving northerly along this main track for the purpose of coupling onto the Swift car. Muldowney was the switchman who followed the engine and made the couplings and uncouplings between the switch engine and the various cars to be switched. He was standing on one of the steps provided for that purpose on the rear of the tender attached to the switch engine. When the engine had reached a point about three car lengths from the south end of the Swift car it was shut off and drifted gradually, slowing down until it was going two or three miles an hour. Yardmaster Stickels, who was standing approximately twenty feet from the south end of the Swift car when the engine approached it, thinking it was about time for the engineer to slack ahead, turned around and observed Muldowney's lantern lying between the cars in the middle of the north bound track. Muldowney was between the coupler of the locomotive and the coupler on the southerly end of the Swift car. He was standing upright, facing north. Stickels then called the engineer to move ahead.

After the switch engine had been moved ahead, Yardmaster Stickels rescued Muldowney, had him placed in an ambulance and taken to a hospital where he died without recovering consciousness. Within twenty minutes following the removal of Muldowney the crew attempted to proceed with the switching operation. The switch engine stood twenty feet south of the Swift car, where it had stopped after the discovery of Muldowney's accident. It backed up to contact the coupler on the Swift car but the coupling did not make. The knuckle on the Swift car was then opened and another attempt to couple the car with the engine was made but the coupling again failed. The drawbars on the switch engine and the Swift car were out of alignment to such an extent that a coupling could not be made without an adjustment of the drawbars. The engine was then slacked ahead and the knuckles on both the Swift car and the switch engine were opened and the drawbar on the Swift car was adjusted. After a switchman had adjusted the drawbar on the Swift car, the cars coupled automatically.

Ordinarily, where a drawbar is off center it may be straightened by taking hold of it with the hand and pulling it over to normal position. The coupling apparatus is so constructed as normally to have a play of one and one-half inches to either side, or an overall play of three inches. This play is necessary to permit cars when coupled together to pass around curves without danger of derailment or injury to the cars, and in order that cars may be coupled together on a curve. The coupling apparatus on the tender was so constructed as to permit a movement of the drawbar, within limits, from side to side, and because kept oiled it could be moved from side to side with little effort; but the drawbar on the refrigerator car required greater effort to move from side to side. If couplers are not lined up correctly, they will not couple automatically. When out of alignment or off center, it is the usual custom for the brakeman to step between the cars and push or pull the drawbars over with his hands, and in the instant case it was the duty of Muldowney to see that these cars were properly coupled and if there was an adjustment to be made in the drawbars, it was his duty to make it as he was engaged in an attempt to make this coupling. If the couplers are out of alignment beyond the normal play, the

coupling will not make automatically even though both knuckles are opened. The adjustment of the drawbars can not be made by use of the lever-operated pinlifter.

Based upon the opinion of an expert witness, the jury might have found, and manifestly did find, that the presence of a man's body between the two drawbars could not have forced the drawbars out of line, and that the presence of a man's body between the couplers, under the circumstances disclosed by the evidence which was embodied in a question, would cause the knuckles to close; that the drawbars on the Swift car and the switch engine were at and immediately prior to the time of the accident so far out of alignment that the coupling would not make automatically; that observing this condition of the couplers Muldowney, while the engine was slowly moving toward the Swift car, stepped off the engine in between it and the Swift car for the purpose of adjusting the drawbar and in so doing was caught between the couplers.

■ It is contended by plaintiff that the jury might also have properly found that the engineer brought the engine to a complete stop approximately twenty feet from the point of accident and then started it up to make the coupling. This contention is based upon the testimony of Mrs. Muldowney to the effect that the fireman told her the engine was brought to a stop twenty feet south of the Swift car just prior to the accident. On cross-examination the fireman was asked whether he had made such a statement, alleged to have been made long after the accident occurred, and he denied having made it. The statement, if made, was no part of the res gestae and was not binding on the defendant. It was admissible only as bearing upon the credibility of the witness and it had no tendency to prove the truth of the subject matter. Wiget v. Becker, 8 Cir., 84 F.2d 706; Southern R. Co. v. Gray, 241 U.S. 333, 36 S.Ct. 558, 60 L.Ed. 1030; Riggs v. Metropolitan Street Railway Co., 216 Mo. 304, 115 S.W. 969.

■ ■ The duty imposed upon a common carrier engaged in interstate commerce by rail to equip and maintain on all cars used by it couplers coupling automatically by impact is an absolute one. Any violation of this duty resulting in injury to an employee gives rise to a liability irrespective of actual negligence on the part of the carrier other than mere failure to comply with the requirements of the Act. It is not only the duty of the railroad to provide such couplers, but to keep them in such operative condition that they will always perform their functions. The test of compliance is the operating efficiency of the couplers with which the car is equipped. San Antonio & A. P. R. Co. v. Wagner, 241 U.S. 476, 36 S.Ct. 626, 60 L.Ed. 1110; Delk v. St. Louis & S. F. R. Co., 220 U.S. 580, 31 S.Ct. 617, 55 L.Ed. 590.

■ In the final analysis the crucial question of fact in this case is whether at the time of the accident the couplers involved were in such condition that they would not couple automatically on impact. The evidence by which this ultimate fact is sought to be established is circumstantial. Such an ultimate fact is susceptible of proof by circumstantial evidence the same as any other fact. Lowden v. Burke, 8 Cir., 129 F.2d 767; Geraghty v. Lehigh Valley R. Co., 2 Cir., 70 F.2d 300; Williamson v. St. Louis-San Francisco Ry. Co., 335 Mo. 917, 74 S.W.2d 583. When the Swift car, with three other cars, was detached from the train it was put through certain switching movements during which it, with three other cars, was "kicked" back to the balance of the train. Just what effect this "kick back" may have had upon the coupling or drawbar does not appear. It must be borne in mind that Muldowney at the time of the accident was engaged in an attempt to make this coupling. He was not, as suggested, proceeding to cross the track between the engine and the Swift car for the purpose of going to the yard house. There is no evidence that that was his purpose and to have done so would have been a desertion of his post in the midst of an important movement in which he was performing an essential part. His activities, we have a right to assume, centered around the successful completion of his undertaking. If the drawbars were out of alignment to the extent that the coupling could not be made automatically on impact, that condition could only be cured by adjusting in some way these drawbars and that involved some movement of them. This could not be effected by the hand lever, and if the condition existed it was the duty of Muldowney not only to detect it but to remedy it. Assuming for the moment that this condition existed, the jury might well have concluded not only that he observed the condition but that he was in the act of at-

tempting to remedy it. In doing so it was necessary for him to pass between the ends of the cars. If the assumed condition existed, the only good faith effort he could have made to couple necessitated an adjustment of the drawbar. Any attempt to make the coupling without such adjustment would be futile. Manifestly, the rule as to prior effort can not, in such circumstances, be applicable. Geraghty v. Lehigh Valley R. Co., supra; Hampton v. Des Moines & Central I. R. Co., 8 Cir., 65 F. 2d 899; San Antonio & A. P. R. Co. v. Wagner, supra; Atlantic City R. Co. v. Parker, 242 U. S. 56, 37 S.Ct. 69, 61 L.Ed. 150. It is therefore important to determine whether there was substantial evidence warranting a finding by the jury that the drawbars were out of alignment.

Following the accident, the switch engine slacked back from the Swift car a distance of twenty feet and there remained without movement until some twenty minutes later when a further effort was made to make the coupling with the Swift car. The Swift car in the meantime had not been moved nor otherwise changed. On a fair trial the coupling failed to make on impact. A switchman testified that he opened the knuckle on the Swift car and signaled the engineer to back the switch but the coupling did not make. He made adjustment of the drawbar on the refrigerator car, moving it east. He said, "I shoved it to the east." He also said that he got under the drawbar and lifted it over. After the adjustment of the drawbar, both knuckles were opened and the coupling then made on impact. It is, however, urged that while this evidence may have established the bad condition of the coupler after the accident it was insufficient to show that such condition prevailed before the accident, and hence, the finding of the jury is based upon surmise and speculation. The jury had before it evidence of all the circumstances and of the physical facts as they existed at the time of the accident. There was involved in the accident an attempted impact between the couplers, resulting in the crushing of Muldowney. That is the only evidence from which it might possibly be claimed the condition of the drawbars might have been altered by reason of the accident. A witness of wide actual experience and observation was placed upon the witness stand and asked whether in his opinion the contact with Muldowney's body under the circumstances disclosed by the evidence, would be sufficient to account for the displacement or misalignment of these drawbars. He testified that it would not; that the contact with the body would close the knuckles if they were open but could not possibly affect the alignment of the draw bars. The jury, of course, had before it the evidence that the engine was gliding very slowly and stopped apparently immediately upon contact. If this testimony was admissible, it was, we think, when considered with all the attending facts and circumstances, sufficient to warrant the jury in finding that before the accident the drawbars were out of alignment to such an extent that a coupling could not be made automatically on impact. Lowden v. Burke, supra, Hampton v. Des Moines & Central I. R. Co., supra; San Antonio & A. P. R. Co. v. Wagner, supra. The witness had had a wide and varied experience in switching operations. He was familiar with coupling devices and had operated and worked in and about them for many years in the capacity of switchman and trainman. He knew from experience the relative weight and size of locomotives and cars and the manner in which coupling operations were made. The evidence showed that the switch engine was moving slowly, drifting at an estimated speed of from two to three miles an hour as it approached the coupling. In these circumstances the weight of the engine was not of major importance as it appeared that the weight of the engine under such movements was restrained by the brakes. The undisputed evidence shows that the engine was properly handled in the attempt to make this coupling. The qualification of the witness was not challenged in the lower court by any objection, nor was it objected that the fact sought to be elicited was not one to be proved by opinion evidence.

██ It is, however, argued that proper foundation was not laid for the opinion expressed by this witness. An objection of this sort is not sufficient which simply charges that proper foundation has not been laid. If it is claimed that the question does not embody all the material evidence, the objection must point out what evidence is omitted so that it may be corrected. It is now argued that the opinion assumes that Muldowney stood erect without moving or struggling when caught between the couplers, but no such suggestion is contained in the objection. These matters were properly the subject of cross-

examination and went to the weight of the testimony and the credibility of the witness, rather than to the admissibility of the testimony.

In view of the verdict of the jury, whose province it was to determine the question of proximate cause, the contention that the violation of the Safety Appliance Act was not the proximate cause of Muldowney's death need only be given passing notice. The condition of these couplers necessitated his going between the ends of the cars. He may have been negligent in so doing, but that is not a defense. There was enough evidence to go to the jury upon the point that the drawbars were so out of alignment that the coupling could not be made by impact. As said by the Supreme Court in San Antonio & A. P. R. Co. v. Wagner, supra [241 U.S. 476, 36 S.Ct. 630, 60 L.Ed. 1110],

" * * * it clearly is the legislative intent to treat a violation of the safety appliance act as 'negligence,'—what is sometimes called negligence per se.

"In various forms plaintiff in error raises the contention that it was plaintiff's improper management of the coupling operation that was the proximate cause of his injury. But any misconduct on his part was no more than contributory negligence, which, as already shown, is, by the employers' liability act, excluded from consideration in a case such as this."

It is mildly urged that the court erred in refusing instructions requested by the defendant. The argument is bottomed on the same contentions already considered by us in connection with the court's ruling in denying defendant's motion for a directed verdict. In so far as the requested instructions correctly stated any principle of applicable law, they were covered by the instructions given by the court on its own motion. The court charged the jury that,

"If the deceased on approaching the south end of the Swift & Company freight car discovered that the coupler was off center or in such position that a coupling could not be made, it was proper for him to undertake to adjust or align it, if he proceeded to do so in the usual and customary manner and was using due care for his own safety."

This instruction was favorable to the defendant because it in effect re-

quired that the plaintiff be in the exercise of due care for his own safety. In other words, it gave the defendant the benefit of the defense of contributory negligence, to which under the law it was not entitled. This instruction was not, of course, given until after the court had passed upon the motion for a directed verdict, and it was incumbent upon the court correctly to declare the applicable law as it existed at the time when ruling upon the motion for a directed verdict. We are clear that the instructions as a whole do no violence to any right of the defendant.

The judgment appealed from is therefore affirmed.