LILLIE, J.
On the theory of negligence under the Federal Employers Liability Act and a violation of the Safety Appliance Act (Automatic Couplers Act), plaintiff sued defendant Southern Pacific Company, his employer, for damages for injuries sustained during switching operations in defendant’s yard. It is from a judgment against him entered on a jury verdict plaintiff appeals. Among the issues raised for our consideration is the trial court’s error in giving an improper and prejudicial instruction relating to the Automatic Couplers Act.
Only two witnesses testified to the circumstances of plaintiff’s fall—plaintiff and defendant’s crew foreman, Richard Hatch.
Plaintiff, a switchman, was working on a train consisting of an engine and 40 cars situated on the lead track. He had *427 been instructed to ride a cut of five ears from the lead train onto track 8 and couple onto three cars already standing there, await two more cuts—one of six and the other of four cars— and after coupling, to secure them. Plaintiff rode the five cars onto track 8, coupled, causing an impact, released the brake, and descended to the ground where he walked to the front of the eight cars to adjust the brakes and await the additional cuts. As he did so, another impact occurred causing to roll down the track the eight cars which plaintiff boarded. He stopped them and remained standing on the catwalk on top of the middle ear awaiting the second cut. Another impact of less force occurred, moving the ears slowly; and thinking this to be the second cut, plaintiff controlled the brake to permit them to roll down the track. Thereupon “a terrific jolt” hit the cars from behind, causing the one on which plaintiff was standing to lurch, throwing him to the ground.
Hatch, the crew foreman, testified that on the end of each freight car is a coupler and each coupler has a moving part known as a knuckle; that ears are coupled by causing them to come into contact with each other with at least one knuckle open; and that if there is a coupling failure the contact of the ears will cause a bump. He further testified that after he sent the first five-ear cut to plaintiff, he personally disengaged the six-car cut from the train and sent it down track 8 to couple onto the rear car of the eight cars then standing on the track. The knuckle of the coupler of the lead car was open and the ears were moving 3 or 4 miles per hour, a speed sufficient to enable the cut to couple onto the eight cars already on the track. He heard the impact, but because of the dense fog was unable to see if coupling occurred. However, when the six-car cut came to a halt, he noticed the end car fouled the track preventing other moves and, to move what he then believed to be the 14 cars farther up the track to get the end car out of the way, and using it as a ramrod, bumped the end ear on track 8 with the train, then consisting of 25 ears. He heard another impact down the yard, saw a light come off the top of a box car and went down to investigate. Plaintiff was lying on the ground. Hatch then learned for the first time that the six-car cut had not coupled. He found the knuckle of the coupler of the lead car of the six-car cut closed.
At the request of plaintiff, the trial court read to the jury numerous instructions pertaining to the Safety Appliance Act. The jury was properly instructed that a coupler, to comply with the act must be one which, when operated in the *428 manner intended, performs its functions under all ordinary conditions; that it is unlawful for a railroad company to use on its lines any car not equipped with couplers which couple automatically by impact; and that it was the absolute duty of defendant to equip the car in question with a coupler that would work efficiently at all times. The court further instructed that the test for determining whether there had been a violation of the Automatic Couplers Act is—“Was there a fair trial, that is: was there an honest effort to attempt a coupling by impact, was it attempted in the ordinary, reasonable, customary manner”; that if there was not a fair test given and the coupling failed to operate, there was no violation of the act—if there was a fair trial and the coupler did not operate at the time and place of the accident and its failure proximately caused the injuries in question, a violation of the act occurred; and that liability for failure to comply is absolute and not dependent upon lack of reasonable care—the violation is itself negligence. The propriety of none of these instruction has been questioned.
However, the last instruction given in the series, submitted by defendant and of which plaintiff complains, reads as follows : “Under the Safety Appliance Act the failure of couplers to make a joint, is not, in itself a violation of the Federal Safety Appliance Act. If you find that it is a fact that couplers in perfect condition will, under certain circumstances, fail to make a joint, and if you further find that the defendant railway company equipped its car with the type of coupler required by the Interstate Commerce Commission, and that it was not defective, then your verdict must be for the defendant railway company and against plaintiff on his cause of action under the Safety Appliance Act.” Appellant contends that this instruction is improper and prejudicial in that it contains an erroneous statement of the law, constitutes a formula for verdict, and refers to matters concerning which no evidence appears in the record.
The Automatic Couplers Act makes it unlawful for any railroad company, such as respondent, to use on its lines any car not equipped with “couplers coupling automatically by impact” (Safety Appliance Act, § 2). The obvious purpose of this statutory requirement is the prevention of exposure of railroad employees to the risk and danger formerly incident to working between cars to effect coupling. The Supreme Court "early swept all issues of negligence out of cases under the Safety Appliance Act” and “held that failure of *429 equipment to perform as required by the . . . Act is in itself an actionable wrong, in no way dependent upon negligence and for the proximate results of which there is liability that cannot be escaped by proof of care or diligence (Citations) ” {O’Donnell v. Elgin, Joliet & E.R. Co. (1949), 338 U.S. 384, 390 [70 S.Ct. 200, 94 L.Ed. 187, 16 A.L.R2d 646]). “ (T)he duty under the Acts is not based on the negligence of the carrier, but is an absolute one requiring performance ‘on the occasion in question’ ”; and no “question regarding the normal efficiency of the couplers is involved in an action under the Safety Appliance Acts” {Affolder v. New York C. & St. L.R. Co. (1950), 339 U.S. 96, 98 [70 S.Ct. 509, 94 L.Ed. 683]). As well settled is the rule that “the absence of a ‘defect’ in a coupler cannot aid the railroad if the coupler was properly set and failed to couple on the occasion in question”; nor is the fact that the coupler functioned properly on other occasions material {Carter v. Atlanta & St. A. B. R. Co., 338 U.S. 430, 434 [70 S.Ct. 226, 94 L.Ed. 236]). Neither is it any defense “that too much was demanded of it (the coupler) ” or “that while the coupler broke it had been properly manufactured, diligently inspected and showed no visible defects” {O’Donnell v. Elgin Joliet & E.R. Co. (1949), 338 U.S. 384, 393 [70 S.Ct. 200, 94 L.Ed. 187, 16 A.L.R.2d 646]).
 The defenses open to the railroad under the Automatic Couplers Act are limited, since they cannot be based on negligence; but one of the few available arises out of a failure of the device to couple on impact because the coupler had not been properly opened {Carter v. Atlanta & St. A. B. R. Co., 338 U.S. 430 [70 S.Ct. 226, 94 L.Ed. 236]; Affolder v. New York C. & St. L.R. Co. (1950), 339 U.S. 96, 99 [70 S.Ct. 509, 94 L.Ed. 683]; Hallada v. Great Northern Railway, 244 Minn. 81 [69 N.W.2d 673], cert, den., 350 U.S. 847 [76 S.Ct. 119, 100 L.Ed. 755J); and “whether, after the couplers were placed in their open or proper position they failed to couple automatically on impact” is a jury question {Affolder v. New York C. & St. L.R. Co., supra, 99-100) which goes directly to whether a fair trial had been given, which trial requires that at least one of the couplers be in an open position and that they be brought together with sufficient impact to effect coupling.
Another defense suggested by the court in the O’Donnell case, supra, might arise out of certain special circumstances not here material, such as the failure of the coupler to hold *430 because it was “broken or released through intervening and independent causes other than its inadequacy or defectiveness; such, for example, as the work of a saboteur” (O’Donnell v. Elgin Joliet & E.R. Co. (1949), 338 U.S. 384 [70 S.Ct. 200, 94 L.Ed. 187, 16 A.L.R.2d 646]; footnote 7, p. 394); but the record before us is silent concerning any circumstances justifying such a defense. However, it does show the existence of a factual issue relating to whether the coupler was open before the impact. Although the conflict does not appear to be a substantial one due to Hatch’s positive testimony that he personally opened the coupler immediately before the car was sent down track 8, nevertheless Hatch’s further testimony that immediately after plaintiff’s fall he looked at the couplers on both ears and found them closed, might warrant an inference to the contrary. Whatever conflict in this regard exists, of course, goes only to the jury question whether a fair test had been given, which test requires that at least one of the couplers be in an open position before impact. Incidentally there appears to be no question concerning the other requirement of a fair trial—that the couplers must be brought together with sufficient impact to effect coupling—in view of Hatch’s undisputed testimony that he started the six-car cut down track 8 at 3 or 4 miles per hour, a speed sufficient to effect coupling.
As to the factual question whether at least one of the couplers was in an open position at the time of the impact, the record discloses that Hatch personally disengaged the six-car cut by lifting the pin lift opening the knuckle of the coupler on the lead ear. He personally observed that the coupler was open when he sent the car down track 8. After the impact which he then believed coupled the cars, but which did not, he attempted to butt the end ear out of the way. Another impact ensued. After plaintiff’s fall, Hatch learned for the first time coupling had not occurred. It was his job, not plaintiff’s, to open and set the couplers, and Hatch stated positively that he personally opened the knuckle of the coupler on the lead car of the six-ear cut, and one knuckle was open—so positive in fact was he that he testified “I’d stake my life on it”—and personally inspected the coupler before he sent the cut down and knew the coupler was open on the way down track 8. However, he also testified that immediately after the last impact and plaintiff’s fall, he inspected the couplers and found the knuckles closed; but thereafter the coupler worked properly.
*431 Assuming that Hatch opened the knuckle before he sent the cut down the track, no explanation was given by any witness as to what, if anything, happened to the coupler between that time and the time of the impact (which failed to make a joint), after which the knuckle was found closed. Whatever caused the coupler to fail, the evidence is undisputed that it was not broken, split, cracked or falling down; the speed at the impact was sufficient to make a joint; all of the switching movements were normal; all movements were in the ordinary operation of the railroad; the impact which should have caused coupling did not; “it (the coupler) did not close itself” on the way down track 8—“it couldn’t have because it was open when it left”; and after the two impacts, neither of which caused coupling, the coupler operated properly. With the exception of that involving the opening of the coupler, no other factor was involved; and the record is entirely silent concerning any special or “certain circumstances” that could have caused the coupler to fail to operate and which could properly constitute a defense under the statute.
Although counsel for the railroad sought to establish a misalignment of the drawbars and that the impact took place on the curved portion of track 8, by asking a series of general questions designed to show that if one coupler is off center position the couplers could not make a joint on impact, and that this could happen on a curved track—the attempt to show that this is what occurred here was wholly unsuccessful. A careful examination of the entire record simply does not support evidence to that effect. The only evidence elicited on this point was from the railroad’s own employee, Hatch; and he testified that “in a switching movement like this, they (couplers) wouldn’t be like that (misaligned).” His further testimony was that he pulled the pin lift opening the coupler on the straight track; that although track 8 has a curve in it for a ear length past the switch and then straightens out, he pulled the pin knowing of the existence of the curve, and that the impact which should have produced the coupling actually took place not on a curve but on the straight portion of track 8; and of significance is Hatch’s uncontradicted testimony that there was nothing to indicate that the coupler on the lead car was not in alignment so that it would couple onto a car on any place on track 8, “whether it was on a curve or no. ” The railroad’s questions of Hatch relative to the failure of a device to couple on a curving track because it is not properly lined up were general in nature; the closest the railroad’s counsel *432 came to referring to the instant case was when he asked Hatch “ (T)hat impact would have occurred where the track is curving here on 8 within that car length, wouldn’t it?”; his answer, speculative and indefinite was: “Well, it could, sir.” But Hatch’s testimony relative to the situation at bar definitely rules out any evidence either that there was a misalignment or that the impact in question occurred on curved track. He was uncontradicted in his testimony that there was nothing to indicate that the coupler was not in alignment to prevent coupling on curved or straight track, and he further testified that the impact that should have caused coupling took place “on a straight track” because the cars “were approximately two or three car lengths deep into the track which, in my opinion, would make them couple in on a straight track. ’ ’
As significant as the fact that there is no evidence before us establishing misalignment of the drawbars, or that the impact occured on a curved track, is the questionable propriety of such a defense had it been factually established. A curve in the track in switching yards is not unusual. It constitutes part of the regular equipment of a railroad and switching cars on such a track constitutes part of the normal railroad operations. Couplers must withstand wear and tear under all normal conditions. “ (T)he act certainly requires equipment that will withstand the stress and strain of all ordinary operation, grades, loadings, stops and starts, including emergency stops.” (O’Donnell v. Elgin Joliet & E. R. Co., 338 U.S. 384, 393 [70 S.Ct. 200, 94 L.Ed. 187, 16 A.L.R2d 646].) In consideration of the purpose of the act, the requirement that couplers must operate under ordinary conditions and the prior decisions which have refused to absolve railroads from liability on a defense of drawbar misalignment (Atlantic City R. Co. v. Parker, 242 U.S. 56 [37 S.Ct. 69, 61 L.Ed. 150]; San Antonio & A. P. Ry. Co. v. Wagner, 241 U.S. 476 [36 S.Ct. 626, 60 L.Ed. 1110]; Chicago, St. P., M. & O. Ry. Co. v. Muldowney, 8 Cir., 130 F.2d 971; Hampton v. Des Moines & Cent. I.B. Co., 8 Cir., 65 F.2d 899; McGowan v. Denver & R.G.W.R. Co., 121 Utah 587 [244 P.2d 628], it is clear “that, although the failure of couplers to couple automaticaly upon impact does not constitute a violation of the Federal Safety Appliance Act unless one of the coupler knuckles is open, it is no defense that the failure to couple upon impact is caused by a misalignment of the drawbars.” {Hallada v. Great Northern Railway, 244 Minn. 81 [69 N.W.2d 673], cert, den., 350 U.S. 874 [71 S.Ct. 119, 100 L.Ed. 755],) In Kansas City Southern *433 Ry. Co. v. Cagle (1956), 229 F.2d 12, cert, den., 351 U.S. 908 [76 S.Ct. 697, 100 L.Ed. 1443] ; the court stated at page 14, “ (w)ithout exception the eases have held that operating a car on which the drawbar is so far out of line as to prevent automatic coupling violates the Act and imposes absolute liability. ’ ’ On the issue of the curved track, the court in Atlanta Coast Line R. Co. v. Brown (1956), 93 Ga.App. 805, said at page 876 [92 S.E.2d 874] : “ (I)t has been held that the fact the coupling took place on a curve does not relieve the railroad of the duty” under the act.
The uncontradicted fact remains that the coupler failed to operate on impact; and the only defensive issue which the evidence admits for the consideration of the jury is whether a fair trial was given at the time and place the coupler failed to operate—did Hatch open the coupler before he sent the cars down track 8 ? Even then, the evidence to the contrary appears to be but slight.
Viewing the instruction in question in the light of the Supreme Court decisions and the record before us, it appears to contain an erroneous statement of the law; and to be inapplicable to the evidence in the ease, ambiguous and uncertain in the terms employed, and prejudicial to the plaintiff. Beginning with the opening statement of the instruction— “Under the Safety Appliance Act the failure of couplers to make a joint is not, of itself, a violation”—we find this rule covered in a prior given instruction which explains to the jury that the test for determining if there has been a violation is— upon a fair trial was there a failure to couple? It is the law that if there was not a fair trial on the occasion of the accident, and the device failed to couple, there was no violation; obviously if the coupler was not open before impact then the test could not have been a fair one.
But the balance of the instruction is faulty in many respects. We do not know how the jury could have determined the meaning of the words “couplers in perfect condition” as used in the instruction. The phrase could be construed as meaning couplers free from defect in view of the term “defective” later employed in the same instruction, reference to which is wholly immaterial and improper as hereinafter set forth; or the phrase could be construed to mean couplers in perfect position for coupling on impact—that is, properly opened. If the former meaning was intended, any instruction taking into consideration the lack of, or existence of, a defect in the *434 coupler is clearly erroneous, for whether a coupler is free from defect is not material, and cannot aid the railroad; and this particularly applies to that further portion of the instruction that if, among other things, the jury finds the coupler is not “defective,” it must find for the defendant. In ruling out just such a defense as improper in a similar ease, the Supreme Court stated in Carter v. Atlanta & St. A. B. R. Co., 338 U.S. 430, at page 433 [70 S.Ct. 226, 94 L.Ed. 236] : “. . . the absence of a ‘defect’ cannot aid the railroad if the coupler was properly set and failed to couple on the occasion in question. See O’Donnell v. Elgin Joliet & E. R. Co. (1949), 338 U.S. 384, 390, ante, 187 [70 S.Ct. 200, 94 L.Ed. 187, 16 A.L.R,.2d 646] and cases cited.” If the phrase “couplers in perfect condition” be construed to mean couplers properly opened for coupling on impact, then the words “certain circumstances ’ ’ used in the same instruction have no meaning and are ambiguous, misleading and erroneous, for it is clear from the record before us that there are no other “certain circumstances” in the evidence which could constitute a defense under the act. What, then, are the “certain circumstances” referred to? They could not reasonably relate to the failure of the coupler to be in an open position prior to the impact since that factor is contemplated and included in the “fair trial” covered in prior instructions. Under evidence such as we have before us, an instruction that “certain circumstances” will justify a verdict for the defendant without specifying what they might be (in view of the absolute duty imposed upon the railroad under the act not dependent upon diligence or due care and the very limited defenses open to the railroad, none of which are here present), reasonably leads the jury to pure speculation and gives it an opportunity to improperly consider every possible defense, valid or not, even suggested by counsel during discussion or examination, whether or not proved. The true rule is set out in respondent’s brief “that if the coupler was properly set and failed to couple on the occasion, a violation of the Act occurred”; and the only requirements of a fair test are that at least one of the couplers be in an open position and that they be brought together with sufficient impact to effect a coupling. If they fail such a test the act is violated. There does not exist in the record before us any of the limited circumstances mentioned by our courts justifying the failure of a device to couple automatically on impact when given a fair test; nor is it reasonable that the jury should believe that the “certain *435 circumstances” mentioned in the instruction related to the lack of a fair test because the coupler was not properly set. In addition, besides being clearly erroneous because it asks the jury to determine if the coupler was defective, the meaning of the following at the close of the instruction—that if the jury finds “that the defendant railroad company equipped its ear with the type of coupler required by the Interstate Commerce Commission and that it was not defective,” then it shall find for defendant—completely escapes us; for there is no mention in the record of the kind of coupler required by the Interstate Commerce Commission, nor was any proof offered in this connection.
Although the formula instruction has never been favored and its use frequently criticized (Tice v. Pacific Electric Ry. Co., 36 Cal.App.2d 66 [96 P.2d 1022, 97 P.2d 844]; Elsey v. Domecq, 114 Cal.App. 42 [299 P. 794]; Taha v. Fine-gold, 81 Cal.App.2d 536 [184 P.2d 533]), the rule “that a formula instruction must contain all of the elements essential to a recovery has been somewhat relaxed where the conditions and surrounding circumstances indicate that it should not be applied in its original strictness” (Amidon v. Hebert, 93 Cal.App.2d 225, 228 [208 P.2d 733]); and it is now recognized that the fact that an erroneous instruction sets out a specific formula is only a circumstance which may be considered in determining whether, on the whole record or charge to the jury, prejudice resulted. However, in the case at bar, we hold the erroneous, ambiguous and incomplete statement of the law in the instruction, not cured or aided by reference to other given instructions, to be error implicit in which is clear prejudice to the appellant; and thus there are before us no “conditions” or “surrounding circumstances” to permit a relaxation of the rule condemning an instruction which sets forth an improper specific formula for verdict. We do not think the entire charge sufficiently and properly informed the jury of the relevant legal rules under the Automatic Couplers Act.
Inasmuch as we hold the instruction to be in form and content improper and prejudicial, we deem it unnecessary to consider appellant’s other assignments of error.
For the foregoing reasons the judgment is reversed.
Wood, P. J., and Fourt, J., concurred.